(30 App. Div. 463.)

BUCKLEY v. MAYOR, ETC., OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. June 10, 1898.)

VOLUNTARY PAYMENT—COERCION.

 The agents of a defendant city, acting within the scope of their authority, illegally demanded and received for it, from the plaintiff, an owner of real property, for a certain permit, a sum of money to which the city was not entitled, as a condition of permitting him to complete an unfinished building. Their demand being accompanied by threats made to his workmen that, unless this money was paid, the latter would be arrested by the defendant's other agents, the police, also acting within the scope of their authority, and the work stopped, the owner paid the amount demanded, in the belief that these threats would be executed, and under the stress of necessity for prompt completion of unfinished building. On learning that the city was not entitled to it, he demanded its repayment, which was refused by the city. *Held*, in an action to compel the restoration, that the acts of the defendant's officers amounted to coercion in fact, and that the payment could not be considered voluntary.

 McLaughlin, J., dissenting.

Appeal from trial term, New York county.

Action by John J. Buckley against the mayor, aldermen, and commonalty of the city of New York. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before BARRETT, McLAUGHLIN, PATTERSON, and O'BRIEN, JJ.

Theodore Connoly and William B. Crowell, for appellant.
Albert I. Sire, for respondent.

BARRETT, J. The defendant has in its treasury $403, which it received from the plaintiff's assignor, Walker. To this sum, it is conceded, it has not a shadow of right. It received the money for a permit to Walker to do what the law authorized him to do. Buck. v. Collis, 17 App. Div. 465, 45 N. Y. Supp. 291. Shall it be compelled to restore the money which it thus unjustly and unconscionably retains? That is the sole question here, and its solution depends upon whether Walker's payment of the money was voluntary or compulsory. The facts are these:

In May, 1897, Walker was building an apartment house in this city. He had excavated the area space in front and on two sides of the building, and had let out a contract to cover this area space with vault lights. While this work was being done, one Cousine, an inspector in the department of highways, visited the premises, and told the foreman who was in charge that, if he did not obtain a permit to construct the vault in question, he would notify the police, and have him arrested. This inspector ordered the foreman to stop the work, and the latter accordingly did so. The general method of enforcing such an order was, as the inspector testified, as follows:

"I will tell you how I do it. I notify them to stop. If they didn't, and I found that they have not got the necessary permit, I go to the nearest telephone, and call up police headquarters; and the captain of the precinct stations a man there until they get the necessary permit there." .

He added:

"My duties were to notify the party to stop work, and, if he didn't stop, I would have him arrested. I generally go to the telephone, and call up headquarters, and they notify the police; and, if I can't find a policeman on the beat, I go on until I can find one on post, and I will notify him. They watch it, and I come along twice a day, or three times a week, or ten times a week."

And, again, this witness emphasized what transpired:

"I notified the foreman to stop putting those patent lights in until he went downtown and procured the necessary permit, and he then stopped. I notified him I would have him arrested. They all know me. They know what the result will be when they see me jump off the car. At the first notification when I told him to stop, he did stop, for I told him I would have him arrested."

One McManus, a clerk in the department of highways, testified that his instructions from both the commissioner and deputy commissioner of public works were that he "must allow no vault to be built without payment and the issuance of the permit. * * * My instructions were not to allow persons who failed to apply for permits to go on with the work." Under these instructions, to again quote his testimony, he "proceeded to stop them from going on with their work by sending an inspector to the work to notify the parties that they would be interfered with. The inspector was Mr. Cousine, and they were notified through him to stop work until they obtained the permit, and, if they didn't stop, what would take place." The foreman notified Walker of the threats; and the latter could see for himself that the work was stopped. Thereupon Walker went down to the department of public works, paid the money, and obtained the permit. He did so, he says, because he did not want to contend with the public authorities; so that his men could work. "If I had not done it," he testifies, "the man could not have proceeded with the work. I went down and paid for this permit, so as to prevent my man from being arrested, and in order to go on with the work without public interference by the authorities." He knew that the same course had been adopted with others; that the threats to arrest his men and stop his work were part of a general system; and he believed that he would be treated as others had been.

It is difficult to perceive here any element of a voluntary payment.

It was plainly compulsory. There is no iron-clad rule which confines an involuntary payment to cases of duress of person or restraint of goods. Money compulsorily paid to prevent an injury to one's property rights comes within the same principle. Carew v. Rutherford, 106 Mass. 1. In this case, it was held that a conspiracy against a mechanic, who is under the necessity of employing workmen to carry on his business, to obtain a sum of money from him which he is under no legal liability to pay, by inducing his workmen to leave him, and by deterring others from entering his employment, or by threatening to do these acts, so that he is induced to pay the money demanded, under a reasonable apprehension that he cannot carry on his business without yielding to the illegal demand, is an illegal conspiracy. The acts done under it are illegal, and the money thus obtained may be recovered back. Is it not entirely clear, in the case at bar, that Walker was under a reasonable apprehension that he could not complete his apartment house without yielding to the defendant's demand? Was not the stoppage of work upon his building an injury to his property, within the definition of subdivision 10 of section 3343 of the Code of Civil Procedure? The defendant's threats were certainly threats of actionable acts whereby his estate would be lessened. Every day that was thus lost to him was a serious pecuniary injury. And yet we are told by the appellant that the payment was voluntary, because Walker personally was not arrested or threatened with arrest, and because his tangible property was not actually seized or threatened with seizure. This contention proceeds upon an entire misapprehension of the true rule. His property, in a legal sense, was injured by the acts of the defendant's servants. It was the threatened exercise of power which Walker believed they possessed that was likely to take money out of his pocket every day that it continued. Interest on his capital would be running, and increment from rents would be postponed.

The rule upon this branch of the case was stated with great clearness by Mr. Justice Field in Radich v. Hutchins, 95 U. S. 210, 213, as follows:

"To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, from which the latter has no other means of immediate relief than by making the payment."

It is the "moral coercion," spoken of by Judge Brown in Adams v. Bank, 116 N. Y. 611, 23 N. E. 7, which entitles the plaintiff to recover the money paid because of it. The narrowness of the strict common-law rule with regard to duress was said in that case to have been "much mitigated," and money paid under practical compulsion allowed in many cases to be recovered. "The very word used to describe an involuntary payment," said Judge Peckham in Tripler v. Mayor, etc., 125 N. Y. 625, 26 N. E. 723, "implies that there is some fact or circumstance which overcomes the will and imposes a necessity of payment in order to escape further ills." So, in Maxwell v. Griswold, 10 How. 256, it was said that it suffices to make a payment involuntary if it "is caused on the one part by an illegal

.demand, and made on the other part reluctantly, and in consequence .of that illegality, and without being able to regain possession of his property except by submitting to the payment." This was there .called the obtaining of money by a moral duress not justified by .law.

It is also contended that Walker had a legal remedy, and should have resorted to it. He might, doubtless, have essayed an action in .equity to restrain the defendant, or he might have brought an action at law for his damages. Or he might have directed his employés to defy the public authorities, and take their chances with a habeas corpus. But, while any one of these various remedies was taking its regular course, what was to become of his unfinished :building? He might have been ruined before even partial redress .could thus be afforded him.

As far back as Astley v. Reynolds, 2 Strange, 915, a legal remedy was held to be no answer to an action like the present. "We think," :said the court in this case, "that this is a payment by compulsion. The plaintiff might have such an immediate want of his goods that ·the action of trover would not do his business.   *   *   *   We must take it he paid the money relying upon his legal remedy to get it back." This case was cited with approval in Harmony v. Bingham, 12 N. Y. 109, Judge Edwards saying that it was referred to with .approbation by Lord Mansfield in the case of Smith v. Bromley, 2 Doug. 697, note; and he adds, "I have not found any English case .in which it has been doubted." Judge Edwards also cited with approval Cartwright v. Rowley, 2 Esp. 723, quoting the following ob- ·servations from Lord Kenyon's opinion there:

"I recollect a case of ——— v. Pigott, where this action was brought to recover back money paid to the steward of a manor for producing at a trial ·some deeds and court rolls for which he had charged extravagantly. The ·objection was taken that the money had been paid voluntarily, and so could not be recovered back again; but it appearing that the party could not do ·without the deeds, so that the money was paid through necessity and the ·urgency of the case, it was held to be recoverable."

This case (Harmony v. Bingham) is a direct authority against this particular contention of the defendant. In his concurring opinion ·there, Judge Ruggles goes over the same ground, citing Chase v. Dwinal, 7 Me. 134, and quoting from Judge Weston's opinion in the latter case, in these words:

·"That replevin would have restored the property unlawfully seized, but to .procure a writ and an officer to serve it would have occasioned delay, which ·might have subjected the plaintiff to greater loss than the payment of the money demanded. Besides, he must have given a bond to the officer to pros- .ecute his suit, and he might meet with difficulty in obtaining sureties, and .that the delay in bringing a trespass suit to a finale might have been attended ·with serious inconvenience."

The threats in the case at bar were made by the defendant, and were to be executed by it. They related to the direct action of its .own police force, to be summarily invoked by its other agents. Both .of these agencies were part and parcel of the defendant's general ·municipal rule. Walker was not bound to defy these potent agencies. He was but an individual. The entire machinery of corporate :government was against him. It was said by Judge Woodruff in

Insurance Co. v. Britton, 8 Bosw. 153, that persons dealing with public officers and their deputies and agents do not stand with them upon equal ground. "In such cases," he continued, "I concur with the views of Martin, B., in Steele v. Williams, 20 Law & Eq. 319, 8 Exch. 625, that the payment is not voluntary." The language of this eminent judge, preceding that which we have quoted, is pointedly applicable to the case at bar. There the defendants compelled the plaintiffs to pay them $300 upon the threat that, unless it was paid, they would telegraph to the comptroller at Albany, and stop their license to do business as an insurance company. The money was paid, and the plaintiffs sued to receive it back. The court held that they were entitled to recover it. Judge Woodruff answered the contention that the plaintiff might have had legal redress, and should therefore have refused to pay the money, with this reasoning:

"Although the defendants had no legal power to interfere further, and although the plaintiffs would have had legal redress, and might have compelled the comptroller to give them the required certified copy of their charter, still they were not bound to take the hazards of delay, and the risk of having to litigate the question, and treat the requirements and threats of those appointees of the comptroller as idle words. They might, as they did, pay the money exacted, and, when the pressure under which they paid was removed, submit the right to determination, as they have done, by reclaiming the money as an illegal exaction, as money obtained by the defendants without consideration, and which, in justice and equity, they may not retain."

It would be difficult to find a stronger authority than this for the plaintiff's right to recover here.

It but served to confuse the real issue to attempt to apply to the present facts the rule laid down in cases where it was sought to recover money paid under illegal assessments. The question is not as to money paid under mistake of fact or mistake of law; it is simply whether the defendant shall be compelled to restore money which it illegally coerced from the plaintiff's assignor. There was no attempt to coerce Walker by legal proceedings. The threat which coerced him was a threat of brute force. The city took upon itself to become judge, jury, and sheriff; and it was in that attitude that it made its demand.

The case of Wood v. Mayor, etc., 25 App. Div. 577, 49 N. Y. Supp. 622, is not in point. There the plaintiff asked for a permit to build certain vaults in space, for part of which a permit had already been obtained. He claimed that the deduction which the commissioner was willing to allow on account of the old permit was insufficient. Nevertheless, he paid the amount demanded, and got his permit. There was absolutely no coercion in fact; and Presiding Justice Van Brunt said:

"There is no evidence but that the plaintiff had the freedom of exercising his will. If his position was correct, he had no necessity for any new permit; but as he wanted a new permit for the whole of the premises, and thought it was worth paying for, it is difficult to see how he can get the money back."

The fact that Walker went through the form of applying for a permit is quite immaterial. The substance of the matter is that the defendant's agents, acting within the scope of their authority, illegally demanded and received for the city $403 to which the latter was not entitled, as a condition of permitting Walker to complete his

unfinished building. Their demand was accompanied with threats made to Walker's workmen that, unless this money was paid, the latter would be arrested by the defendant's other agents, also acting within the scope of their authority, and the work stopped. This demand and these threats were communicated to Walker, and he paid the amount in the belief that such threats would be executed. He paid it under the stress of the necessity for prompt completion of his unfinished building. And the defendant, with full knowledge of the facts, now ratifies the acts of these agents, stands by them in fact, and unconscionably insists upon retaining the money thus acquired. Upon both principal and authority, we think it clear that this amounts to coercion in fact, and that the defendant should be compelled to make restoration.

The judgment should be affirmed, with costs. All concur, except McLAUGHLIN, J., dissenting.

The action was brought to recover a sum of money from defendant upon the following complaint: "The plaintiff, complaining of the defendant, shows to the court as follows, upon information and belief: First. That the defendant is a municipal corporation, duly organized and existing under the laws of the state of New York. Second. That on the 11th day of May, 1897, the defendant became indebted to one Alexander Walker, plaintiff's assignor, as hereinafter shown, in the sum of four hundred and three $82/100$ dollars, to the use of the said Alexander Walker, in manner following, to wit: The said Alexander Walker, on and prior to the 11th day of May, 1897, was the owner of an apartment house, with stores underneath, situate on the northwest corner of the Boulevard and Ninety-Third street, in the city of New York, said premises being intended for dwelling and business use, and was properly denominated a tenement house with stores underneath, as such property is defined in the act of the legislature of the state of New York entitled chapter 567 of the Laws of 1895, passed May 9, 1895. That on and prior to the said 11th day of May, 1897, one Charles H. T. Collis was the duly-authorized agent officially representing the defendant in the capacity of commissioner of public works, and one Howard Payson Wilds was the duly-authorized deputy commissioner of public works of the city of New York. That said Alexander Walker, plaintiff's assignor, was desirous of covering over a certain area space in front of and on two sides of his said building, with vault lights consuming the space of two hundred and one ninety-one one-hundredths square feet (201 $91/100$ sq. ft.); but that the defendant, by the aforesaid Collis, as commissioner of public works, had for a long time prior to the 11th day of May, 1897, caused it to be publicly known that he, in his official capacity, would cause the arrest of all persons who might undertake to cover area spaces in front of their buildings with vault lights without paying a sum of money to defendant in this action, or to the department of public works for the benefit of this defendant, in return for the permit issued by the said commissioner of public works, which would authorize the holders thereof and those paying therefor to peaceably lay said vault lights over their area spaces; and said commissioner of public works furthermore publicly issued threats to the effect that he would tear up and remove all vault light work which was laid without the authority of the permit, and would prosecute criminally in courts of law all persons undertaking to lay vault lights without a permit. That the said Alexander Walker, having knowledge of the said public threats and menaces, and in order to secure peaceably permission to lay said vault lights, and avoid threatened arrest and legal proceedings in the event of his disobeying the orders of the said department, on the 11th day of May, 1897, as aforesaid, did apply to said commissioner of public works, as the official representative in this action of the defendant, for a permit to construct said vault lights; and, in return for the same, the said commissioner of public works demanded from said Walker, and received from him, as a consideration for the alleged privilege granted, the sum of

.$403.82, or at the rate of $2 per superficial square foot of area spaces covered; that said Alexander Walker paid for said permit the said sum of $403.82, under duress and coercion, and said payment was an illegal exaction and ·extortion of money by the defendant herein, for the reason that the property on which said permit was to apply was, by chapter 567 of the Laws of 1895, ·expressly exempted from paying for vault permits within area lines. Third. 'That, thirty days prior to the commencement of this action, the said Alexander Walker duly filed with the comptroller of the city of New York, in accordance with section 1104 of the consolidation act (Laws 1882, p. 305), a claim in writing, setting forth the facts as aforesaid, and making a demand for refund of ·said $403.82, with interest thereon from the time said money had been paid. Fourth. That the defendant has never paid the said Alexander Walker said .sum of $403.82 so demanded. Fifth. That, prior to the commencement of this .action, said Alexander Walker, by a writing duly executed, assigned to this plaintiff all his right, title, and interest in said claim against the defendant herein, and this plaintiff is now the legal owner and holder thereof. Where-.fore plaintiff demands judgment against defendant for the sum of $403.82. ·with interest from May 11, 1897, with the costs of this action."

McLAUGHLIN, J. (dissenting). The rule is well settled by an un-.broken line of decisions in this country and in England that money voluntarily paid, in satisfaction of an unjust and illegal demand, with full knowledge of the facts and circumstances under which it is ·demanded, and without fraud, duress, or compulsion, cannot after-wards be recovered by the person paying the same. This principle is so well established and universally recognized that it is unnec-·essary to cite a single authority to sustain it. It is, however, con-tended that the judgment appealed from should be sustained for .the reason that the payment for which a recovery has been had was .not voluntary, but compulsory. After a careful consideration of the :record before us, I am unable to reach that conclusion. ·The facts .are undisputed. At and for some time prior to the time the pay-ment referred to was made, the city of New York, acting under a .supposed legal right, exacted from property owners a fee for per-mission to cover certain area about buildings constructed by them with vault lights. In May, 1897, Alexander Walker, plaintiff's as-·signor, was constructing a building, and in connection therewith de-sired to cover certain area space with vault lights, and, for permis-.sion to do so, voluntarily paid this fee. I say voluntarily paid, be-cause, as it seems to me, no other construction can be put upon his acts. He employed a contracter to put up the lights, and, while en-.gaged in doing that work, an officer of the defendant called upon the contractor, "and wanted to know if he had got a permit"; and, on being informed that he had not, the officer told him that he must get one or stop work, and, if he did not do one or the other, he would notify the police, and have him arrested. The contractor stopped work, notified Walker of what had transpired, and he thereupon ap-plied for, and, on paying the sum of $403.82, obtained, permission ·from the city to proceed with the work. No objection of any kind was made by Walker to paying just what the city demanded, and the ·sum was paid by him without even a protest. Some time thereafter, this court decided (Buck v. Collis, 17 App. Div. 465, 45 N. Y. Supp. :291) that the city had no legal right to exact from property own-·ers, and they were under no legal obligation to pay to it, any sum whatever for permission to use their property in the manner in which

Walker was using his. This action was then brought to recover the amount paid, and, at the close of the evidence, judgment directed for the plaintiff, upon the ground that the defendant "coerced" Walker into paying what he did.

I think the learned trial justice erred in thus directing a verdict. The facts stated in the complaint, as well as the testimony given by Walker upon the trial, clearly and conclusively show that the payment by him was entirely voluntary. Upon referring to the complaint, it will be observed that the allegation in reference to the payment of the money was simply that the commissioner of public works for a long time prior to the time the payment was made had caused it to be publicly known that in his official capacity he would arrest all persons who undertook to cover area space in front of their buildings with vault lights, without permission from the city so to do; and that Walker, having this knowledge, "and in order to secure peaceable permission to lay said vault lights, and avoid threatened arrest and legal proceedings in the event of his disobeying the orders of said department," applied for and obtained a permit by paying the sum heretofore stated. Upon the trial, Walker testified:

"I was never personally threatened with arrest on that building. As soon as I heard of these public threats, I went down there of my own accord, to avoid any legal proceedings. I didn't want to contend with the public authorities, and I voluntarily went there, and paid this money to avoid any litigation. I did it so my man could work. If I hadn't done it, the man could not have proceeded with the work."

Can a payment made under such circumstances be said to be compulsory? It seems to me not. No fraud was practiced upon Walker. No threat was made to induce the payment. It may be assumed that what was said to the contractor, so far as the rights of the parties are concerned, was the same as though said to the owner of the building. All that it amounted to was this: That an ordinance of the city relating to the construction of vault lights must be complied with, or the city would institute legal proceedings to enforce the same, and the owner of the building, rather than contest the validity of the ordinance, made the payment. It was, at most, an illegal demand made by the city in ignorance of the law, which was complied with by Walker either for the same reason, or else from a desire on his part to avoid litigation. Neither ignorance of the law nor a desire to avoid litigation enables a party to maintain an action to recover money paid. Walker, when he made the payment, was possessed of all the facts connected with or growing out of the demand by the city, and he then had an opportunity to determine the legality of the claim. He could have then had his day in court, and demonstrated, had he so desired, that he was under no legal obligation to pay what the city asked, and that it had no right to execute the threat made. He could have applied for and obtained immediate relief by enjoining the city from interfering with the work which he was doing, and thus avoided any delay in the completion of his building. This is just what was done in the Buck Case, above referred to. He preferred, however, if we accept his own statement, to make the payment rather than enter into a contest at that time with the city; and, having done so, it must be held that he is es-

topped from claiming that the city had no right to the money. This must be so unless we are prepared to hold that in every case in which money has been collected by a municipal corporation acting under an illegal ordinance, or in violation of law, it can thereafter be recovered by the party paying the same.

The language of Gibbs, J., in Brisbane v. Dacres, 5 Taunt. 143, is quite applicable to the facts of this case.

"We must," says the learned judge, "take this payment to have been made under a demand of right, and I think that where a man demands money of another, as a matter of right, and that other, with a full knowledge of the facts upon which the demand is founded, has paid a sum, he can never recover back the sum he has so voluntarily paid. It may be that, upon a further view, he may form a different opinion of the law, and it may be his subsequent opinion may be the correct one. If we are to hold otherwise, many inconveniences may arise. There are many doubtful questions of law. When they arise, the party has an option, either to litigate the question, or to submit to the demand, and pay the money. I think that, by submitting to the demand, he that pays the money gives it to the person to whom he pays it, and makes it his, and closes the transaction between them."

The case just referred to was cited with approval in Redmond v. Mayor, etc., 125 N. Y. 632, 26 N. E. 727, Judge Gray observing:

"The long-established and well-recognized general rule on the subject of voluntary payments is that when made with knowledge of the facts, and not induced by the fraud of the other party, they are beyond recall in law."

The language of Metcalf, J., in Benson v. Monroe, 7 Cush. 125, is also quite applicable. He says:

"It is an established rule of law that if a party, with full knowledge of the facts, voluntarily pays a demand unjustly made on him, and attempted to be enforced by legal proceedings, he cannot recover back the money as paid by complusion, unless there be fraud in the party enforcing the claim, and a knowledge that the claim is unjust."

And to the same effect is Flower v. Lance, 59 N. Y. 603; Tripler v. Mayor, etc., 125 N. Y. 617, 26 N. E. 721; Wood v. Mayor, etc., 25 App. Div. 577, 49 N. Y. Supp. 622. The principle involved in Wood v. Mayor, etc., cannot be distinguished from the principle involved in this case.

It is, however, suggested that the defendant, because it received the money without a legal right, ought not to be permitted to retain it. But the court considers, not the moral, but the legal, rights and obligations of parties. Parties, if they see fit to do so, can stand upon their legal rights; and the court can only perform its duty by enforcing such rights according to well-recognized principles of law. Whatever, therefore, may be said as to the moral obligation of the city to return that which it had no legal right to receive, the fact nevertheless remains that the plaintiff's assignor, when he made the payment to the city, had an adequate remedy at law had he seen fit to have then resisted the demand made upon him. This he did not do, but made the payment, either in ignorance of the law, or rather than enter into a contest with the city. Under such circumstances, the court is powerless to compel the return of the money, without doing violence to a principle of law long since declared and generally recognized.

For these reasons, I think the judgment should be reversed.