(42 App. Div. 430.)

## HORNER v. STATE.

(Supreme Court, Appellate Division, Third Department.   July 6, 1899.)

1. CONVICTS—CONTRACT FOR SERVICES—CONSTRUCTION.

Plaintiff contracted with the warden of the state's prison for the use of the machinery and tools of the hollow-ware industry and the iron-castings industry in the prison: the warden to furnish convicts to manufacture on the piece-price system for certain fixed prices, and to maintain the engines and boilers necessary to run the machinery, and plaintiff to maintain the plant during the existence of the contract.   The contract also provided that. out of the convicts, there should be employed a sufficient number in making patterns and flasks.   On a new warden being appointed, he objected to the contract on the ground that the men could not earn as much for the state as they ought to earn, and insisted on certain payments by plaintiff, which plaintiff was compelled to make in order to retain the services of the convicts, though under protest.   On the trial of a claim to recover such payments, it was urged by the state that the excess so paid was collectible under the contract for the labor of the men making the patterns, but no such claim was made at the time of the payment.   *Held*, that the provision relied on did not secure to the state the right to demand any compensation whatever for the time in which any of the convicts should be employed in such work, there being no provision in the contract to that effect; nor any for fixing any basis on which the value of such services should be adjusted.

2. PAYMENTS UNDER DURESS.

Where one under contract with the state for convict labor at the state's prison is compelled by the warden of such prison, in order to retain the services of the convicts, to pay an additional sum to the state, without a shadow of right, and the payment is made under protest, and only to protect the plaintiff from what he apprehended would be a much greater loss, plaintiff can recover the money so paid, as paid under duress, though the act of the state was at most a mere breach of contract, as plaintiff had no right of action against the state which he could go into the courts and enforce, and because his remedy by presentation of a claim for damages to the board of claims would be impracticable.

Merwin, J., dissenting.

Appeal from court of claims.

Action by Michael T. Horner against the state of New York.   From a judgment dismissing his claim, plaintiff appeals.   Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Albert B. Boardman, for appellant.

John C. Davies, Atty. Gen., and John H. Coyne, Dep. Atty. Gen., for the State.

PER CURIAM.   The appellant in this matter on April 25, 1893, entered into a written contract with C. F. Durston, as warden of Auburn state prison, whereby he agreed to pay to the state of New York the sum of $3,000 per annum for the use of its machinery, tools, and all appliances belonging to the "plant of the hollow-ware industry, and also the iron-castings industry," as then carried on in said prison.   The warden agreed, on the part of himself and his successors, to furnish 200 convicts to manufacture in such plant, upon the piece-price system, hollow ware and other iron castings, for which labor the appellant was to pay certain prices therein specified for

each article manufactured. The warden was to keep up and maintain the engine and boilers and main shafting necessary to run the machinery used in the business; and the appellant was to keep up and maintain the plant at his own expense during the existence of the contract, and leave the same in as good repair and condition as when received, ordinary wear and tear excepted. All materials for the making of the articles manufactured were to be furnished by the appellant. Such contract was to commence on May 1, 1893, and to continue for three years, and was approved by the superintendent of state prisons. On May 1, 1893, Durston was retired, and James C. Stout was made warden in his place. After work had progressed for a short time under the contract, Stout notified the appellant that the men could not earn, at the prices therein fixed, as much for the state as they ought to earn; that they ought to earn at least 50 cents per day per man, making to the state the sum of $100 per day for the 200 men; and that, unless the prices per piece were modified so as to produce that sum, he would shut up the men and terminate the contract. The appellant declined to make any modification of the contract, and it is very clear that thereafter, for some months, the warden, with the assent of the superintendent of state prisons, entered upon a course of conduct with reference to the work done under the contract by which they endeavored to force the appellant to comply with their terms. A detailed statement of such conduct is not appropriate to an opinion. It is sufficient to say that we are satisfied that such conduct, if continued during the term of the contract, would have rendered it unprofitable to the appellant, and that he thereupon became convinced that his business under such contract would be thereby practically destroyed. About the 1st of August, 1893, the appellant and the warden, Stout, had an interview, in which the appellant was informed that, unless he paid the amount per day which the warden demanded, he would be put out of the prison. Thereupon the appellant refused to make any modification of the prices or of the contract, but agreed that he would pay, over and above the daily earnings of the men under the contract prices, a sufficient sum to make up $100 each day during the continuance of the contract, and that such excess might be charged as for labor of men in making flasks and patterns. But he at the same time protested against such payments being exacted, claiming that the state had no right to them under the contract, and declaring that he would not "vitiate the contract in any way," but would come back and get the money afterwards, if he could, from the state. From that time forth the work proceeded upon that basis. Payments were made each month to the amount of $100, or thereabouts, per day, and the excess so paid, and charged against the appellant for "labor in making flasks and patterns," amounted in all to $23,865.34. Upon the expiration of the three years the state adjusted with the appellant all claims for wear and depreciation of the plant, and all matters arising under the contract, except that the appellant still claimed that the excess so paid should be refunded to him. To this claim the state-prison authorities refused to accede. An act of the legislature authorized such claim to be heard before the court of claims. It was

brought to a hearing before such court, and a judgment rejecting it was entered therein, and from such judgment this appeal is taken.

. It was claimed upon the part of the state in the court below, and it is urged upon us here, that this excess so paid was in fact collectible, under the terms of the contract, for labor of the men in making patterns, flasks, etc., and such claim is based upon a provision of the contract which reads as follows:

"Out of the number of men aforesaid there shall be employed a sufficient number in the making of patterns and flasks, and preparation and care of tools, and giving out of stock, and weighing and preparation of the same for use, and for the storing and loading and shipping of the articles produced, and the necessary clerical force in the office of the party of the second part within said prison."

It is manifest from the evidence that no such claim was made by the warden when he insisted that the men could not earn enough under the contract, nor was it so claimed when the appellant agreed to pay the excess. Neither party then claimed that the state could collect anything for such labor, but both parties rather seemed to agree, that it could not. In our opinion, the provision relied upon does not secure to the state the right to demand any compensation whatever for the time in which any of the 200 men should be employed in such work. There is no provision therein to that effect, nor fixing any basis upon which the value of such service could be adjusted. Nowhere in the contract does the appellant undertake to pay anything extra for such service, and it is evident the provision was not inserted for that purpose. There was much work to be done within the prison to carry on the business of manufacturing such articles, other than the mere work done on the article itself; and it was wise to insert in the contract a distinct provision that such work, which is fairly and substantially specified in the provision, should be done by the convicts. It was work appurtenant to the manufacturing business contemplated, and such as must be done by the convicts, or else men from outside must have been imported to perform it. Naturally, it was provided that some of the 200 convicts furnished should do it, and it is clear that no extra compensation was provided for such service. The purpose evidently was to make the price fixed upon each article cover the whole service necessary for its creation and shipment. It is claimed that the contract provides that the appellant is to do all such work at his own expense. But such claim is not correct. Evidently most of the work specified in such provision is no part of "keeping up and maintaining the plant." . The "repairing of machinery and flasks, and preparation and care of tools," might be included in such obligation; and whatever the convicts did in that respect might possibly have been charged against appellant as work done to his use, but more than that was not chargeable against him, and no attempt was made to keep an account of such services, or to agree upon an adequate compensation for them. A sum sufficient to make $100 per day was charged against services in making flasks and patterns. Seemingly, that was an increase, and not a repairing, of the plant. A large amount of new flasks and patterns were made, and subsequently sold

to the state, and it is apparent from the record that the excess received was not considered as services rendered to appellant in keeping the plant in repair.

We are of the opinion that the excess so paid by the appellant was not collectible under the contract. It was received by the state without giving any compensation in exchange therefor, it was money to which the state had no legal claim, and the question is squarely presented whether it was paid under such duress or coercion as will sustain an action to recover it back. In Scholly v. Mumford, 60 N. Y. 501, it is said: "To constitute a voluntary payment, the party paying must have the freedom of exercising his will. When he acts under any species of compulsion, the payment is not voluntary." And such compulsion need not necessarily consist of unlawful restraint, or threatened injury to the person, or unlawful detention of his goods. In Bates v. Insurance Co., 3 Johns. Cas. 239, in an action for money had and received, plaintiff was allowed to recover back the amount that he had paid the defendant in order to procure from it a transfer on its books of certain shares of its stock that he had purchased from the one in whose name it then stood. The company unlawfully required plaintiff to pay to it a debt which it held against his assignor, before it would consent to a transfer of the stock. The court said, referring to the action for money had and received, "The equitable extension of this kind of action has of late been so liberal that it will lie to recover money obtained from any one by extortion, imposition, oppression, or taking an undue advantage of his situation." Again it is said, "The money being inequitably demanded of him, he must be presumed to have paid it relying on his legal remedy to recover it back." In the case of Robertson v. Frank Bros. Co., 132 U. S. 17, 10 Sup. Ct. 5, money paid to avoid the exaction of an unlawful penalty was recovered back, and it was there held that "virtual or moral duress is sufficient to prevent a payment made under its influence from being voluntary." "When moral duress, not justified by law, is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not to be regarded as voluntary." Swift Co. v. U. S., 111 U. S. 22, 4 Sup. Ct. 244, is to the same effect. In Buckley v. Mayor, etc., 30 App. Div. 463, 52 N. Y. Supp. 452, the plaintiff was allowed to recover back money paid to the city to avoid an apprehended detention in the erection of a building in New York City. In that case the question as to what is a voluntary payment is thoroughly discussed, and it is there said: "There is no iron-clad rule which confines an involuntary payment to cases of duress of person or restraint of goods. Money compulsory paid to prevent an injury to one's property rights comes within the same principle." See, also, Carew v. Rutherford, 106 Mass. 1; McPherson v. Cox, 86 N. Y. 473, 479. Within the principle of the cases above cited, and which seems to be the rule now generally adopted, the payment by the appellant, under the circumstances of this case, should not be deemed a voluntary one. It certainly was not made to adjust any disputed claim which the state made under the contract, for the state threatened to repudiate the contract unless the

money was paid. The money was demanded without a shadow of legal right, and was paid under protest, and only to protect the appellant from what he apprehended would be a much greater loss. It is argued that as matter of fact the contract did not prove to be a valuable one to the appellant, and that he would have lost nothing had it been abandoned. But such fact has no application to the question whether the appellant paid this money voluntarily or not. The contract was to run three years, and he might well expect that it would prove a profitable one. From year to year he might hope that the coming market would improve, and that the future would make up for past losses. He believed the contract would prove a good one, and was not ready to abandon it, and thus was coerced to pay the money in order to continue it. It is argued that the appellant could not have been coerced, because the action of the state being, at most, a mere breach of the contract, the appellant was protected against any loss by his right of action for damages; that such right of action was to him a full substitute for any loss he could sustain by the breach. But it must be remembered that he had no such right of action against the state which he could go into the courts and enforce; nor would it be practicable for him to present a claim for such damages to the board of claims, because, until the expiration of the three years during which the contract was to run, it would be impossible to ascertain whether or not the contract would prove profitable, or to ascertain what his damages were because of the warden's refusal to proceed with the same. The uncertain and doubtful remedy which, if any, he had against the state for its refusal to proceed with the contract, was by no means an adequate one, and so he was in fact at the mercy of those officers who were contracting for the state. He had no means of securing the benefits of the contract, save to comply with the warden's demands. See Robertson v. Frank Bros. Co., and Buckley v. Mayor, etc., supra; Beckwith v. Frisbie, 32 Vt. 559; Insurance Co. v. Britton, 8 Bosw. 153; Stenton v. Jerome, 54 N. Y. 480–485.

Two facts seem to be clear in this case: First, the state received, and now holds, this money without any lawful right to the same; secondly, in the language used by the court in the early case of Bates v. Insurance Co., above cited, it obtained it "by taking an undue advantage of his situation." To such circumstances the maxim, "Volenti non fit injuria," has no application, and an action to recover it back should have been sustained. The judgment of the court below was therefore erroneous, and should be reversed.

Judgment reversed, and a new trial granted; costs to abide the event.

MERWIN, J., dissents.