(110 App. Div. 843.)

## F. H. MILLS CO. v. STATE.

(Supreme Court, Appellate Division, Third Department. January 8, 1906.)

### 1. CONVICTS—EMPLOYMENT—CONTRACTS—TERMINATION.

Where a convict labor contract provided that in case of legislative intervention, or any authority outside of and beyond the reasonable control of the state, it should become necessary to discontinue the business, the contractor should not for that reason, have any claim for damages against the state, the refusal of the state to furnish convicts under the contract after the taking effect of Const. art. 3, § 29, providing that on and after January 1, 1897, no person in any prison, etc., should be required or allowed to work while under sentence at any trade, industry, or occupation, wherein or whereby his work or the product or profit thereof should be farmed out, contracted, given, or sold to any person, did not entitle the contractor to recover damages against the state.

### 2. CONTRACTS—BREACH—WAIVER.

A contract for prison labor provided that the board of managers of the reformatory should complete for the use of the contractor a dry kiln in process of building then situated within the reformatory inclosure. The contractor made no complaint of a failure to complete the kiln for several months after the execution of the contract, and then informed the reformatory superintendent that the kiln contracted for would be of no use to the contractor when completed, and entered into negotiations for the construction of a new kiln, which was subsequently completed. *Held*, that the state's failure to complete the kiln contracted for was waived.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 1480, 1481.]

### 3. PAYMENT—VOLUNTARY PAYMENTS—RECOVERY.

A contract for the employment of convict labor in the manufacture of furniture provided for a piece price for making tables, etc., and that the price per piece agreed on from time to time for making of new and additional styles of tables or furniture should be subject to readjustment and be fixed by mutual agreement, and, in case of irreconcilable disagreement, the price should be determined by arbitration. None of the articles mentioned in the contract were ever manufactured by the contractor, but by agreement the price was charged on a basis of 50 cents per day per man, which arrangement was continued until the price was reduced by agreement to 40 cents a day, bills being rendered and paid as for so much labor at a lump sum. *Held*, that the payment of the 50-cent rate was voluntary, and that the contractor could not claim that such rate was tentative only, and that he was entitled to recover as for an overpayment the excess over 40 cents a day.

### 4. CONVICTS—LABOR CONTRACTS—PER DIEM PRICE.

A convict labor contract provided for a piece price basis, but the basis agreed and acted on was a per diem one; the bills being presented and paid as for doing a certain amount of work as agreed for a certain sum of money. *Held*, that the per diem system, which was in violation of Laws 1889, p. 531, c. 382, § 3, providing that labor of prisoners in reformatories shall be conducted under the piece price system, was merely malum prohibitum, and not malum in se, and was therefore insufficient to entitle the contractor to recover money voluntarily paid.

### 5. PAYMENT—RECOVERY—DURESS.

A convict labor contractor, having failed to pay certain monthly statements, as required by the contract, was told that unless the bills were paid the state would not continue to furnish men under the contract, and a resolution was passed by the board of managers instructing the superintendent of the reformatory that, in case of further default, the superintendent should call a special meeting of the managers to take appro-

priate action. *Held*, that such acts by the board did not constitute coercion or duress entitling the contractor to recover payments voluntarily made.

[Ed. Note.—For cases in point, see vol. 39, Cent. Dig. Payment, § 284.]

6. STATES—CONTROL OF CONVICTS—NEGLIGENCE—LIABILITY.

Evidence *held* insufficient to show that the negligence of the state in failing to maintain proper discipline in the reformatory caused a fire and the destruction of property belonging to a convict labor contractor, entitling the latter to recover damages against the state.

Appeal from Court of Claims.

Claim by the F. H. Mills Company against the state of New York. From so much of a judgment of the Court of Claims as dismissed claimant's claim, it appeals. Affirmed.

On the 15th day of March, 1893, an agreement was entered into, bearing date the 16th day of February, 1893, in form, "between the people of the state of New York, represented by the board of managers of the New York State Reformatory at Elmira, N. Y., first party, and Fred H. Mills together with Gustave Stickley, both of Auburn, N. Y., doing business under the firm name of F. H. Mills and Company, second party," wherein it was, among other things, agreed that the party of the first part was to furnish to the party of the second part, for the period of five years from date, the labor of not less than 100 inmates to be selected and assigned to the manufacture of furniture for the party of the second part by the general superintendent of the Reformatory, also the use of certain buildings, machinery, and ground specified in the contract, "also the dry kiln in process of building." The party of the second part agreed to provide material, tools, machinery, instruction, mechanical superintendence, business direction, and to keep constantly employed, for the period of five years, inmates to the extent of not less than 100, and a larger number as may be agreed upon from time to time between the parties, to be employed at the manufacture of furniture, and to pay monthly, on the 20th of each and every month, for the labor of the inmates the month previous, according to a schedule attached and marked "Appendix A," and as may be agreed upon from time to time for other articles to be made for those specified in the appendix. The appendix named several kinds of tables and stated a piece price for the labor employed on each. The agreement also contained the following provisions: "And the first party agrees to keep the buildings above named, in reasonable repair, that is to say as may become necessary from wear and tear and damage from their ordinary use, for the purposes of the second party, above named, and from injury by the elements, provided: That in case the buildings are destroyed by fire, wind or water, or damaged to an extent that destroys their value for the use intended in this agreement, then the first party, using reasonable expedition to repair or replace them, shall not be liable for damages for any delay or injury to the interests of the second party. It is mutually agreed between the parties hereto, that the prices named and set opposite the schedule on tables and articles to be manufactured under this agreement, and also the price per piece agreed upon from time to time for the making of new and additional styles of tables or furniture, shall be subject to readjustment and to be fixed by mutual agreement, provided: That in case of irreconcilable disagreement between the parties as to the price to be paid for the labor of making any article or articles, then it shall be at the option of the first party to refuse to make the same, or the price may be determined by arbitration. It is further mutually agreed that in case by the intervention of legislation, or other authoritative ruling outside of and beyond the reasonable control of the first party, it shall at any time become necessary to discontinue the business agreed to be carried on under this instrument, that then the second party shall not have for that reason any claim for damages against the first party, provided: That whenever for any reason this contract and agreement is canceled or terminated by the first party, that then the second party shall have the right, after first discharging their payments and obligations under

this instrument, to remove their property from the reformatory premises, and provided further: That in case the contract is adjudged by the first party as likely to be abruptly terminated by enactment of Legislature, then the first party shall reimburse the second party for any actual and necessary additional cost to them for citizens' labor to finish up on the reformatory premises the materials in process of manufacture they may, at such time, have on hand there, and on receiving notice from the first party of such actual or prospective legislation, the second party agrees to proceed at once to finish up such materials."

After the execution of such agreement Mills and Stickley assigned and transferred their rights in the same to the claimant, the F. H. Mills Company, a domestic corporation. The claimant commenced operations under the contract on or about the 1st day of June, 1893, and continued to carry on operations thereunder until the 22d day of December, 1896, except that it suspended work in August, 1893, by consent of the board of managers because of business depression and inability to market its products, and did not resume work until February, 1894. On the 22d day of December, 1896, a fire destroyed certain of the reformatory buildings occupied by the claimant and practically all its stock, materials on hand, tools, machinery, and personal property, and also a large amount of tools and machinery belonging to the state. Before the fire, and on the 16th day of October, 1896, the superintendent of the reformatory, in pursuance of the direction of the board of managers, served upon the claimant a written notice that because of the intervention of legislation beyond the control of the party of the first part, and pursuant to the provisions of the contract in relation thereto, the contract would be terminated on the 1st day of January, 1897, and required the claimant to proceed at once to finish the work in process, so that such work would cease and the factory be closed on the 1st day of January, 1897. The claimant acknowledged the receipt of the notice by letter, dated October 6, 1896, in which it denied the right of the board to terminate the contract. Soon after the receipt of the notice the claimant ceased to cut up any new material, and commenced to finish up the work on hand. The claimant did not manufacture any of the articles mentioned in the schedule set forth in the contract, but manufactured about 36 other different articles. The parties never, however, agreed upon a piece price for the labor on any of such other articles. At about the time work was commenced under the contract the parties agreed that the price should be such that the earning power of each man for eight hours' labor should be 50 cents. Bills were made out and presented to claimant monthly, except during the time when the work was suspended, up to June 1, 1894, on that basis, not however, in form for 50 cents per day, but stating an aggregate amount for labor which was equivalent to the rate of 50 cents per day. These bills were paid from time to time by the claimant without other protest than to ask that the price be reduced. On May 29, 1894, after the resumption of work, following the temporary suspension of business, an agreement was reached fixing the price for labor on articles not mentioned in the schedule annexed to the contract on a basis of 40 cents for eight hours' labor. After that bills were rendered on that basis and were paid without protest, and there were no further negotiations between the parties with reference to fixing the piece price. The monthly statements of account rendered by the managers to the claimant show that the amounts charged for labor in each year under the contract was as follows: In 1893, $4,146.21; in 1894, $8,479.77; in 1895, $14,128.52; and in 1896, $14,189,76; making a total charge for labor of $40,944.26. The amount of money actually paid to the state by claimant under the contract was in 1893, $1,067.67; in 1894, $7,798.07; in 1895, $11,407.26; and in 1896, $15,247.92; making a total of $35,520.92. The average number of inmates employed by the claimant in 1893 was 66 per day for 7 months; in 1894, 73 per day for the full year; in 1895, 96 per day for the whole year; and in 1896, 142 per day for the year. There were about 250 working days per year, after deducting holidays and days used by the managers of the reformatory for the military drill of the inmates. The claimant filed a claim against the state pursuant to chapter 612, p. 1467, of the Laws 1898, conferring jurisdiction upon the Court of Claims to determine the claim. The claim interposed was for $137,247.62,

with interest thereon from December 22, 1896. The state filed a counter-claim for $4,639.53, for the balance alleged to be due for labor of inmates under the contract.

A summary of the damages claimed by the claimant is as follows: (1) For not furnishing the inmates to the number required on certain Wednesday and Saturday afternoons by reason of their having been withdrawn for military drill, $6,600.03. (2) For not furnishing inmates during the unexpired period of the five-year term of the contract, $23,453.28. (3) For not furnishing the dry kiln in process of construction, mentioned in the contract, $5,000. (4) For amount alleged to have been overpaid the state upon bills rendered, $31,199.64. (5) For negligence in permitting the property of the claimant to be consumed by fire, $70,994.67.

The claim was dismissed by the Court of Claims, as well as the counter-claim interposed by the state. The claimant has appealed, but the state has not.

Argued before PARKER, P. J., and SMITH, CHASE, and CHESTER, JJ.

John Cunneen, for appellant.
Julius Mayer and Robert J. Fish, for respondent.

CHESTER, J. The respective claims made against the state will be considered in the order in which they are mentioned in the foregoing statement of facts.

1. The claimant appears to have abandoned on the trial its claim to recover damages for withdrawing certain inmates from the employment of the claimant for military services upon Wednesday and Saturday afternoons, as what little evidence there is on this subject is of the most general character and not sufficient to form any fair basis for the award of damages on account thereof, so that no consideration of that phase of the case need here be given.

2. The claim for damages for the alleged breach of the contract on the part of the state has reference to a condition which it seems to me the parties sought to provide against in the contract. For years prior to the date of the contract, there was much public agitation upon the question of the conflict between convict and other labor, and there came to be quite a settled conviction in the minds of many that the labor of prisoners should not be contracted or employed in such a way as to bring it in competition with other labor. This agitation was uppermost in the public mind at the time the contract in question was entered into. It is apparent that the provision in the contract "that in case by the intervention of legislation, or other authoritative ruling outside of and beyond the reasonable control of the first party it shall at any time become necessary to discontinue the business * * * that then the second party shall not have for that reason any claim for damages against the first party," was inserted in the contract by the parties with a view of saving the state from damages in case such anticipated changes were made in the law as would render the employment of convict labor unlawful. The question for us to determine, therefore, is as to whether such provision was effective to save the state from damages, because the managers of the reformatory withdrew the inmates from the employment of the claimant pursuant to the provisions of the Constitution of 1894 and the legislation enacted pursuant thereto. The language employed

in the contract, it is true, is somewhat inapt and not as comprehensive as it might be, yet the intention of the parties appears to be perfectly plain, and such intention should be given effect, unless some legal obstacles stand in the way.

It may well be questioned whether the language of the contract, "outside of and beyond the reasonable control of the first party," had any reference to "legislation," and whether it refers only to "other authoritative ruling," but, if we assume that the language refers to both, the result is not changed, for the legislation hereafter referred to was clearly beyond the control of the managers of the reformatory. The contract was executed March 15, 1893. The constitutional convention convened May 8, 1894. It concluded its labors on the 29th day of the following September. The revised Constitution proposed by it was approved by the people at the general election November 6, 1894, and took effect January 1, 1895. Among the new provisions of the Constitution was the one which provided that "on and after the first day of January, 1897, no person in any prison, penitentiary, jail or reformatory shall be required or allowed to work while under sentence thereto, at any trade, industry, or occupation, wherein or whereby his work or the product or profit of his work shall be farmed out, contracted, given or sold to any person, firm, association or corporation." Const. art. 3, § 29. The Legislature by chapter 429, p. 387, of the Laws of 1896, amended the statutes to conform the same to the provisions of the revised Constitution, by prohibiting contract labor in the prisons, penitentiaries, jails, and reformatories of the state after January 1, 1897, in substantially the same language as that contained in the constitutional provisions. So that we have here an "intervention of legislation," by reason of which, if lawful, it became "necessary to discontinue the business agreed to be carried on" under the contract.

This intervention of legislation was beyond the reasonable control of the party of the first part, which, although nominally the people of the state, was in fact and in law the board of managers of the reformatory, for the reason that the managers alone under the law were authorized to conduct the labor of prisoners in the reformatory under the public account system or piece price system, and therefore alone empowered in their official capacity to make the contract in question. Section 3, p. 531, c. 382, Laws 1889. This legislation was enacted by the Legislature pursuant to the command of the sovereign people expressed in their approval of the revised Constitution at the polls. Nor is there anything in the legislation which impairs the obligation of the contract, for the parties had by the contract itself provided that, in case it became necessary to discontinue the business by reason of legislation, the claimant should not for that reason have any claim for damages against the state. That was one of the conditions or obligations which the parties imposed upon the claimant in the contract and the obligation has not been impaired, but, on the contrary, has been made effective by the subsequent legislation. The denial of damages by the Court of Claims to the claimant on this portion of its claim was simply giving effect to the evident intention

of the parties when the provision in question was put into the contract.

The case of Bronk v. Barckley, 13 App. Div. 72, 43 N. Y. Supp. 400, is not contrary to the conclusion here reached. There it was held that a contract for the labor of prisoners in the Albany Penitentiary under the piece price system, which was in force at the time of the taking effect of section 29 of article 3 of the Constitution of 1894, and of chapter 429, p. 387, Laws of 1896, was not abrogated thereby, but in that case there was not, as here, a provision in the contract permitting the discontinuance of the business before the expiration of the contract without any claim for damages in case of prohibitive legislation.

The conclusion reached will not be changed, even if "the people of the state of New York" is to be regarded as the contracting party of the first part, instead of the board of managers of the reformatory. The term "the people of the state," as used in the contract, is used to signify the people as a body politic or as a political entity called the "state," and not as meaning the people as the sovereign power in the state. The body politic or the state is, under our system, always subject to the control of the sovereign power—the people. Hence, when the work of a representative constitutional convention meets the approval of the sovereign people at the polls, and in that way a change is wrought in the fundamental law, that law in its changed condition binds the people as a body politic, and the power which made the law and the law together constitute an "authoritative ruling outside of and beyond the reasonable control of" the people of the state as a political entity and a contracting party, so in that view of the case the result is the same as if the board of managers is regarded as the contracting party. In any event, the clause in the contract was clearly intended by the parties to provide against damages against the state for the contingency which was foreseen and which actually happened.

3. The dry kiln which was not furnished by the reformatory managers and for which failure damages are claimed had reference to "a kiln in process of building." This, as stated in the contract, was at the north end of the lumber yard near the icehouse within the reformatory inclosure. It appears that no complaint was made of the lack of dry kiln facilities before the suspension of work by the claimant in August, 1893, nor did it ever ask to have the kiln mentioned in the contract completed. During the suspension of work Mr. Beach was employed as manager for the claimant. Soon after the resumption of work he complained of insufficient dry kiln facilities, and told the superintendent of the reformatory that the kiln mentioned in the contract would be of no use to the claimant if it was completed, as it was too remote from the shops and was not constructed on the proper system. Beach and Mills, the president of the claimant company, thereupon entered into negotiations with the superintendent of the reformatory for the erection of a new kiln in a location more convenient for the claimant than the one mentioned in the contract. As an inducement to the authorities of the reformatory to erect the new kiln, the claimant promised to pay its past-due indebtedness in time to use the avails in paying for the cost of the new kiln, and

upon that condition and understanding between the parties the board of managers of the reformatory authorized the superintendent on May 29, 1894, to construct a new dry kiln for the use of the claimant at a cost of $2,500, which amount was afterwards increased to $3,000. There is no proof that the delay in completing the new kiln was an unreasonable one, nor that the claimant was damaged by the delay, and it was in fact completed, ready for use, the fore part of December, 1894. These facts show that the claimant waived any right which it might otherwise have had to have the kiln mentioned in the contract furnished or completed, and there is no foundation in the testimony for damages for any failure in this respect. The testimony had reference to the failure to furnish suitable or adequate dry kiln facilities rather than to the failure to finish the kiln mentioned in the contract. The contract did not require the furnishing of adequate or suitable facilities of that character, and, as the only obligation in the contract which is the foundation of this controversy has been waived by the claimant, it is in no position to claim damages on this account.

4. The Court of Claims denied that portion of the claim relating to the alleged overpayment to the state upon bills rendered, among other reasons, on the ground that all such payments were voluntary. The appellant claims that payments of the amounts charged in the monthly statements were coerced, and that the fair meaning of the contract is that the labor was to be furnished at its fair value. Much of the testimony in this voluminous record is upon the question of the value of convict labor. It seems to me that this mass of evidence was immaterial upon any real issue in the case. There is nothing said in the contract that would justify the conclusion that the labor was to be furnished at its fair value. The parties had not so agreed, but the contract provided for the payment for labor employed in the manufacture of the specific articles therein mentioned at a price specified for each of such articles. The contract also provided:

"The price per piece agreed upon from time to time for the making of new and additional styles of tables or furniture shall be subject to readjustment and to be fixed by mutual agreement, provided that, in case of irreconcilable disagreement between the parties as to the price to be paid for the labor of making any article or articles, then it shall be at the option of the first party to refuse to make the same, or the price may be determined by arbitration."

None of the articles mentioned in the contract were ever manufactured by the claimant, and there was never an agreement between the claimant and the managers upon the piece price for the making of such other articles as were manufactured. There was an agreement, however, that the price should be charged upon a basis of 50 cents per day per man for eight hours' labor. This arrangement continued for a time, but the price was afterwards modified by agreement between the parties by a reduction to a basis of 40 cents per day.

The claimant insists that these prices were understood to be tentative only, and on that theory claims there has been an overpayment. The respondent, on the other hand, claims that the prices were final and so understood by the parties. There was a sharp conflict in the

evidence as to the 50-cent rate, but there is enough to justify the conclusion that it was not tentative but final.   But if it should be assumed for the argument that the 50-cent rate was tentative only, as the appellant claims, and that the 40-cent rate thereafter determined on related back to the beginning of the contract, the difference between the compensation at the one rate and the other was not equal to the amount of the counterclaim of the state which has not been charged against the claimant.   There is substantially no conflict in the evidence that the 40-cent rate was not in any sense tentative, and after the price was reduced to 40 cents on May 29, 1894, no attempt was ever made by either party to adjust the price upon the "piece price system" until after the notice was given, pursuant to the constitutional mandate and the subsequent legislation, to terminate the contract, and after all work under the contract has stopped and then it came in a letter from the claimant's attorney to the managers.

It is claimed that the per diem basis agreed upon was an evasion of the former law requiring that the labor of prisoners in the reformatory should be conducted under the "public account system, or piece price system." Section 3, p. 531, c. 382, Laws 1889.   This may be conceded, yet it is apparent that for some undisclosed reason the basis adopted seemed most convenient for the parties at the time the arrangement was made.   There is no claim that there was any fraud or imposition on the part of the reformatory managers in procuring the adoption of the plan.   Mr. Mills and Mr. Stickley, the original contractors, were each men of large experience with prison labor and its value; the former having been employed in the reformatory and other penal institutions for many years, and the latter having been a contractor for the labor of convicts at Auburn prison.   The agreement fixing the basis for labor at 50 cents per day was made about the time the work commenced.   This continued until the resumption of work after the temporary suspension hereinbefore alluded to.   When Mr. Beach, the new manager for the claimant, took charge, complaints were made that the 50-cent rate was too high.   There was an effort then made to secure an agreement upon the piece price plan for the labor on the articles then being manufactured.   This did not result in reaching such an agreement, but it did result in an agreement to reduce the rate to a basis of 40 cents per day.   This arrangement was made effective, concurrent with, and as a part of, the agreement made May 29, 1894, to erect a new dry kiln.   There is no proof that after that there was any effort to agree upon a "piece price" basis.   The bills presented were thereafter paid, so far as they were paid, without any protest and without any complaint as to the amount charged. While the basis agreed and acted upon was a per diem one, yet the bills presented were not in form made out to the claimant by the day, but were made for doing a certain amount of work as agreed, so that the bills upon their face did not show an evasion or an attempt at evasion of the law.   The parties having agreed upon that course, and having followed it out, not only in the presentation, but in the payment, of bills during the entire period of the operation of the parties under the contract, there has been no overpayment by the claimant and no part of such payments can be recovered from the

state by the claimant on the theory that it has paid more for the labor than it was worth, even if the basis upon which the charge for labor was made was an illegal one, where it appears, as it does here, that the payments were made voluntarily, and not by duress. Flower v. Lance, 59 N. Y. 603. There was nothing morally wrong in adopting a per diem basis. If it was wrong at all, it was so simply because the Legislature had seen fit in the exercise of its paternal care over the people to prohibit it. It was not malum in se, but malum prohibitum. There is no reason, therefore, why the courts should seek to find some method to compel the return of moneys voluntarily paid under such circumstances.

The claim of coercion is based upon the fact that when the claimant failed to pay the monthly statements, as required by the contract, and began to run largely behind in such payments, it was told in substance that unless it paid the bills it could not have the men, and also upon a resolution of the managers instructing the superintendent that in case of further default of the claimant in making payments "to call a special meeting of the managers to take appropriate action." There is no coercion or duress in this. In the contract the claimant had agreed to pay monthly, on the 20th day of each month, for the labor of the inmates the month previous. It was largely in default in making the agreed payments, and it was within the lawful right of the superintendent and the managers to insist upon the payment of the moneys past due, even to the extent of saying that, if the payments were not made, the men would not be furnished. This, too, was within the express terms of the contract, which contained a provision that "in case at any time default shall be made by the second party in their payments * * * that the agreement may be annulled by the first party, and that the second party in such case shall not have or make any claim for damages against the first party." There is nothing in the case of Horner v. State of New York, 42 App. Div. 430, 59 N. Y. Supp. 96, cited by counsel for the claimant, inconsistent with this view. There there was a successful effort on the part of the warden of Auburn prison to coerce a contractor to submit to a modification of a contract for the labor of convicts by increasing the price he paid for such labor upon threats of withholding the men from his service and of putting him out of the prison unless he complied. He yielded and paid the additional amounts under protest in order to save his contract, and a judgment of the Court of Claims dismissing his claim to be refunded the moneys so exacted from him was reversed. The Appellate Division, in its opinion, reversing the judgment, said (page 436 of 42 App. Div., and page 100 of 59 N. Y. Supp.:

"The money was demanded without a shadow of legal right, and was paid under protest and only to protect the appellant from what he apprehended would be a much greater loss."

In this case, instead of attempting to extract from the claimant moneys it was not bound to pay, as was done in the Horner Case, the managers were endeavoring in a lawful way to compel it to do only what it had agreed and was lawfully required to do, by the very means which the contract authorized them to employ.

5. The claim of negligence on the part of the state in relation to the fire which consumed a large amount of the claimant's property is based wholly upon the allegation that the managers failed in maintaining proper discipline in the reformatory, by reason of which the inmates caused the fire and the destruction of property. While there is much in the evidence tending to criticise the management concerning the discipline of the inmates, yet there is nothing to show how any failure in this respect resulted in the fire. In fact, the cause of the fire was not proven, and so far as the testimony goes it still remains a mystery. It originated in a room where the prisoners had been employed, but it originated nearly an hour after all the inmates and every employé of the state had left the building, and there was proof that the claimant's manager and his bookkeeper were the last persons in the room where the fire started before it was discovered. The materials used in the business conducted by the claimant were of a highly inflammable character, and the claimant was quite as much under obligations to use caution against fire as were the managers of the reformatory. The fact that prisoners used waste in the finishing room was known quite as well to the officers and employés of the claimant as to the officers and employés of the reformatory. So, too, the fact that the inmates were criminals and many of them viciously disposed was known to all parties. While it was incumbent upon the reformatory authorities to maintain discipline in the prison among the inmates, in the absence of proof that the fire resulted from lack of discipline, there is no foundation for the charge of negligence against the state. A witness on behalf of the state testified that just prior to the fire he had cleaned up all combustible material which had been left in the vicinity of the place where the fire started. While there was some proof that fires had occurred upon former occasions, there was no proof that any of such fires were caused by the prisoners or by reason of any lack of discipline among them. The evidence is entirely insufficient upon which even to base an inference of negligence on the part of the state in this respect, and the conclusion of the Court of Claims upon the facts submitted to it, that the state has not been shown to be guilty of any acts or omissions making it responsible for the fire, is the only one that could be properly reached upon this evidence.

We are satisfied from an examination of the entire case that the judgment, so far as appealed from, is right and should be affirmed, with costs. All concur.