### GEORGE W. BECKWITH *v.* GUY FRISBIE & SONS.

*Recovery of money paid under protest. Carrier. Assumpsit.*

If a carrier refuse to deliver goods to the owner without the payment of money which he has no right to demand, and the latter, for the purpose of obtaining his property, pay under protest the sum illegally demanded, he may recover it back.

The defendant, a private carrier, contracted late in the fall to transport by canal boat a cargo of oats for the plaintiff from Burlington to New York. The parties both expected that the boat would reach New York that fall, but owing to the lateness of the season, and without any fault on the part of the defendant, the boat was frozen in the canal, and was obliged to lie there all winter. It was necessary for the safety of the boat and cargo that the oats should be taken from the vessel and stored during the winter, and the defendant accordingly procured this to be done. At the opening of navigation in the spring the oats were reloaded and the cargo was delivered at New York; *Held,* that the defendant was entitled to recover of the plaintiff the expense of unloading and storing the oats during the winter.

ASSUMPSIT for money paid. Plea, the general issue. The case was referred and the referee reported the following facts :

The defendants, during the year 1856, and previous to that time, were manufacturers of lime at Willsborough, on Lake Champlain, in the State of New York, and were in the habit of

transporting it to the city of New York for sale, and for that purpose owned and used two canal boats, which carried their lime from Lake Champlain through the canal to the Hudson river, and thence to New York, without unloading. Occasionally the defendants had transported freight in small quantities for other persons on their return trip from New York to Willsborough.

On the 25th of November, 1856, the defendants contracted with the plaintiff to transport for him from Burlington to New York a cargo of oats on their canal boat "Industry" at six cents per bushel, and the cargo was accordingly loaded immediately, and the boat left for New York on the 27th of November. At the time this contract was made the defendants expressed doubts whether the boat would not be prevented by ice from getting through to New York that fall, but the plaintiff said he thought there would be no difficulty in that respect. Immediately after the cargo was loaded the plaintiff paid the captain of the boat, one Reynolds, seventy-five dollars on account of freight. This payment was made in the presence of one of the defendants, who made no objection thereto.

Captain Reynolds, having started with the boat and cargo, proceeded therewith with all reasonable diligence and dispatch in the prosecution of his voyage, and when he arrived within a few miles of Fort Edward, on the Northern Canal, the weather was so cold that the ice obstructed the boat, so that he was unable to proceed further. He then procured a government boat for cutting ice, and with the assistance of that reached Fort Fdward, on the canal, and was unable to proceed further till the next spring, in consequence of the freezing of the water in the canal and the closing of navigation. The captain immediately informed the plaintiff of the closing of navigation, and that the boat and cargo were frozen in at Fort Edward, and that he could go no further, and asked him to direct what should be done with the oats. The plaintiff immediately went to Fort Edward and saw the captain and cargo, and the captain asked him what he should do with the oats, but the plaintiff claimed that the defendants were bound to see the oats through to New York, and declined to direct in the matter, and so informed the captain.

The captain also informed the defendants of the condition of

the boat and cargo. It was necessary and prudent for the secu-
rity of the boat, as well as for the safety and security of the
cargo, to unload the boat and put the oats into a store house, and
it would have been imprudent and unsafe to leave the oats on
board the boat until the opening of navigation the next spring.
The captain unloaded the boat and put the oats in the store of
Taylor & Durkee, at Fort Edward, where they remained until
navigation opened the next spring. The defendants paid Taylor
& Durkee for so storing the oats, during that winter, the sum of
forty-six dollars and ninety-six cents.

While the plaintiff was at Fort Edward, as aforesaid, the cap-
tain was in want of money to defray the expenses of the boat,
himself and men engaged on the boat, and he then repre-
sented this fact to the plaintiff, (neither of the defendants being
then there) and requested payment of twenty-five dollars on
account of the freight, and the plaintiff paid him that sum on that
occasion on account of the freight, and took his receipt therefor.
This money the captain used mostly in the necessary expenses of
the boat and cargo there, and in paying the fare of the men
engaged with him on the boat home, which fare, it appeared, it
was usual for the owners of a boat to pay. The captain charged
such expenditures to the defendants, and credited them the twen-
ty-five dollars, and in a subsequent settlement between the captain
and the defendants, the defendants refused to recognize the
twenty-five dollars as a payment to them ; and in such settlement
it was left unadjusted, the defendants contending that the captain
had no right to receive payment for them. There was no express
authority shown in the captain to receive payment for the freight.
It did appear, however, that when the captain left Burlington
with the boat, the defendants told him one of them would be in
New York when he arrived there, but if not, they would write
him directing him what to do with the freight money.

The referee decided that under these facts and circumstances
the payment of the twenty-five dollars was a proper and legal pay-
ment to the defendants on account of freight, under the contract.

While the boat was frozen in in the canal, before reaching Fort
Edward, and while the captain was waiting for the government
boat, as above stated, he fed to the team which drew his boat

37

one and a half bushels of the plaintiff's oats, the value of which was seventy-five cents.

Early in the spring of 1857 the parties had an interview, at which the plaintiff told the defendants that if they took the oats to New York he should deduct from the freight there the twenty-five dollars and the seventy-five dollars paid by him to Reynolds, and he also claimed that the defendants should pay Taylor & Durkee's bill for the storage of the oats. The defendants said they should take the oats to New York, and should claim the freight at the contract price, deducting the seventy-five dollars, and that they should not deduct the twenty-five dollars, and should claim what they had to pay Taylor & Durkee for taking in and storing the oats, and that unless the plaintiff paid in New York on that basis they should not deliver the oats there; and the plaintiff told them that if he had to pay on that basis in New York, he should do it under protest, and collect back the items in dispute.

In the spring of 1857, and shortly after this interview, and as early as practicable by navigation, the defendants took the oats at Fort Edward on board their boat and transported them to the city of New York, and notified C. P. Peck there (who was the plaintiff's agent to receive the cargo and settle and pay the freight) of the arrival of the oats. Peck claimed of the defendants delivery of the oats on the payment of the balance of the freight on the terms which the plaintiff claimed in the interview between the plaintiff and the defendants, above stated, specifying the particulars thereof; and the defendants refused to deliver them on these terms, but offered to deliver them on payment agreeably to the terms they had claimed in their interview with the plaintiff, and they also told Peck that unless he complied with these terms they should not deliver the oats. After communicating with the plaintiff by mail, Peck informed the defendants he had received directions from the plaintiff to settle on their terms, but to do it under protest, and he accordingly did so. At this time the price of oats was falling in the market.

On trial the plaintiff claimed to recover the twenty-five dollars paid Capt. Reynolds, the amount of Taylor & Durkee's bill, and the seventy-five cents, being the value of the oats fed to the canal boat horses by Capt. Reynolds. The defendants claimed that

the settlement in New York was correct, and according to the legal rights of the parties, and that whether so or not, it was a bar to any recovery by the plaintiff.

Upon this report, the county court, at the March Term, 1859, —BENNETT, J., presiding,—rendered judgment for the plaintiff for the amount of his claim, to which the defendants excepted.

*Geo. F. Edmunds,* for the defendants.

*E. R. Hard* and *J. French,* for the plaintiff.

ALDIS, J. The plaintiff paid the money which he now seeks to recover back, in order to obtain possession of his oats, which the defendants had, and which they refused to deliver up unless the money which they claimed for freight was paid.

The plaintiff claims that the defendants had no right to demand the money which he paid, and that he was under a necessity to pay it to get his goods. From the report of the referee it is obvious that there was a pressing necessity upon the plaintiff to get possession of his oats, in order to sell them. They were in market, their price was falling, and delay involved a loss far greater than the sum alleged to be illegally demanded. He could not wait to settle his rights by law. By payment under protest he sought to avoid what otherwise would have been inevitable loss. Was payment under such circumstances voluntary or compulsory, and can the sum paid be recovered back?

It was decided in the early case of *Astley* v. *Reynolds,* 2 Strange 915, that money unjustly demanded by a pawnbroker for the redemption of plate, and paid by necessity and in order to obtain possession of the plate by the owner, could be recovered back. It was held to be a payment by compulsion. The court said " the plaintiff might have such an immediate want of his goods that the action of trover would not do his business. When the rule *volenti non fit injuria* applies, it must be where the party had his freedom of exercising his will, which this man had not." This has been the leading case on the subject, and has often been referred to and approved; see *Smith* v. *Bromley* 3 Doug. 695, where the doctrine is approved by Lord MANS-FIELD; and *Cartwright* v. *Rowley,* 2 Esp. 722, where it is

approved as having been applied by Lord KENYON to the payment of money through necessity to the steward of a manor, in order to obtain the production of deeds at a trial, for which the steward had charged extravagantly. In *Shaw* v. *Woodcock*, 7 B. & C. 73, BAYLEY, J., recognizes the general principle thus: "if a party has in his possession goods or other property belonging to another, and refuses to deliver such property to the other, unless the latter pays him a sum of money which he has no right to receive, and the latter in order to obtain possession of his property pays that sum, the money so paid is a payment by compulsion, and may be recovered back." In *Atlee* v. *Backhouse*, 3 M. &. W. 650, PARKE, Baron, expresses the principle and notices a qualification of it thus: "if my goods have been wrongfully detained and I pay money simply to obtain them again, that being paid under a species of duress may be recovered back again, but if while my goods are in possession of another I make a binding agreement to pay a sum of money and to receive them back, this cannot be avoided on the ground of duress." But in neither of these cases did the precise point now in question arise.

The case of *Skeate* v. *Beale*, cited by the defendants' counsel, 11 Adol. & E. 983, (39 E. C. L. 294,) was of an agreement in writing to pay rent illegally demanded in order to get possession of the goods distrained. Upon suit brought on the agreement, the plea alleged that the agreement was given to get possession of the property, which the plaintiff threatened to sell, but the pleas disclosed no necessity for giving the agreement, and did not allege it was given under protest. Lord DENMAN held the agreement valid, but noticed the distinction between such an agreement and an actual compulsory payment of money.

In a later case, *Parker* v. *The G. W. R. Co.*, decided in 1844, 7 Mann. & Grang. 253, (49 E. C. L. 252.) where a suit was brought to recover back tolls illegally demanded by and paid to the defendants as carriers, TINDAL, Ch. J., says, "such payments are not voluntary. The parties were not on an equal footing; the plaintiff was acting under coercion, as the defendants would not perform the service to which the plaintiff was entitled until he made such payments." In a still later case, decided in 1851, 7 Eng. Law & Eq. 528, *Parker* v. *The Bristol & Exeter Rail-*

*way Co.*, PARKE, Baron, again laid down the rule as expressed by him in. *Atlee* v. *Backhouse.* He says, " if a man *pays* another money to obtain goods which he has no right to withhold, although duress of goods will not avoid a contract, yet the money so paid may be recovered back and no tender of the smaller sum really due is necessary. The company is bound to know what is a reasonable sum, and charge no more." This was an action to recover back money paid under protest to a railroad company for illegal tolls and fares demanded by them for the carriage of goods.

There are many other decisions in the English courts which it is needless to refer to, as the above sufficiently indicate the preponderance of authority and the established doctrine. Some of the earlier cases which are cited by the defendants do not seem to affect the principle here involved, but rather to turn upon the nature and peculiar application of replevin as a remedy for a wrongful distress of goods. There are others, however, which it is difficult to reconcile with the general current of authority. We have referred to the most important and the most recent decisions, to those which we think show what the law is at this day in England.

Similar decisions have been made in this country. In *Maxwell* v. *Griswold et al* , 10 How. 243, the plaintiff, to avoid being made liable to a penalty under the revenue laws, paid the duties which the collector demanded, but which were more than the law required and then sued to recover them back. The action was sustained.

Judge WOODBURY says, in speaking of the distinction between voluntary and compulsory payments, " it can hardly be meant in this class of cases that to make a payment involuntary, it should be by actual violence or physical duress. It suffices, if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly, and in consequence of that illegality, and without being able to regain possession of his property except by submitting to the payment." See also 10 Pet. 138, *Elliot* v. *Swartwout.*

In New York, in the recent case of *Harmony* v. *Bingham*, 2 Kern. 99, the same doctrine is applied to payments, made under protest, of unjust charges by carriers, where the payments were

necessary to regain possession of the property by the owners. The cases are there very fully examined.

So in Maine ; see *Chase* v. *Dwinell*, 7 Greenl. 134. In our own State there have been no decisions upon the subject, and therefore we have referred more fully than we otherwise should to decisions elsewhere. The principle is, however, stated and recognized in *Center Turnpike Co.* v. *Smith*, 12 Vt. 218, by Judge REDFIELD, though the decision of the case turned upon another question.

The reason of the rule is obvious. To make the payment a voluntary one the parties should stand upon an equal footing. Then there is the free exercise of will, and compromise or payment is voluntary and binding But where one has the advantage of the other, where delay or a resort to the law is indifferent to the one, but may produce serious loss and injury to the other, it is unconscionable to press such advantage to the obtaining payment of unjust demands. That is extortion.

The attention of the court has been called to a distinction claimed as existing in these cases which would forbid the application of the rule to the cause at bar, viz: that the authorities cited are those in which the party exacting the money wrongfully has had a lien, or right to *some* sum in payment, and the amount due could not be ascertained with certainty, while here the plaintiff could tell the precise sum due, and should have tendered that. But we do not find this distinction to exist. On the contrary, in many cases the amount due was ascertainable, and the point has been made that the sum really due should have been tendered, and it has been ruled otherwise. When one having some just claim exceeds his right and exacts an unjust claim, he stands then on the same ground of wrong doing as he who makes a wrongful claim without color of right or office. As the payment in New York, therefore, can have no effect to bar the claims of the plaintiff, if just, we proceed to examine them.

II. The claim of twenty-five dollars for money paid the captain towards freight, is resisted on the ground that the captain had no authority to receive it. It is sufficient to say that the evidence as detailed by the auditor tended to prove it, and we must treat the finding of the referee and the allowance of the

item by the county court as conclusive of the fact that he had the authority.

III. As to the item of seventy-five cents for oats fed by the captain to the team while the boat was waiting for the State boat to break the ice, we think that this was an act within the employment of the servant, and for which the defendants are liable in this action. Whether, if the suit had been *ex delicto* against the defendants, they would have been liable, we do not deem it necessary to inquire.

IV. The next charge allowed by the county court is for forty-six dollars and ninety-six cents, paid for storage and care of the oats at Fort Edward.

The defendants' boat was obstructed by ice at Fort Edward, and could proceed no further till spring. The defendants had used all reasonable diligence and dispatch in proceeding from Burlington to that point, and so far are not chargeable for any fault or neglect.

The safety of the cargo, and of the boat also, required that the oats should be removed and safely stored, and this was done by the captain.

The closing of the canal by ice was an act of Providence which excused the defendants from proceeding further till navigation opened. Thereupon it was their duty to use ordinary care in preserving the property, and this they did. The inquiry now arises, who shall bear the expense of storing the property safely through the winter, the plaintiff or the defendants?

Nothing was said about it in the contract. It was not in their contemplation when the bargain was made, and no provision was made in regard to it. Both expected and intended that the cargo should reach New York that fall, but both knew that the freezing of the canal might prevent it. The price which the plaintiff was to pay the defendants was six cents per bushel, for *freight*, for transp orting the cargo to New York. It did not contemplate that the property should be stored during the winter at some point while on the way. Had either party expected this the voyage would not probably have been begun. Had the question been raised when the contract was made, it seems very plain to us that the plaintiff could not reasonably have asked, nor would

the defendants have agreed, that they should bear the expense of it. It is expense bestowed on the plaintiff's property, and for his benefit; it preserves his property, but does not aid the defendants' interest, which was simply to transport the cargo to New York. We think that equity between these parties requires that this expense should be borne by the plaintiff. And if he was so liable in equity he could not shift the burden on to the defendants by refusing to pay what it was his duty to pay. The law raises an implied promise on his part to pay the defendants for what they might be obliged to expend in preserving his property, when that duty was thrown upon them by their having his property in their care as carriers, and were prevented from completing their contract by an act of Providence. If he has paid it he cannot recover it back.

In this view of the case we regard the defendants as private carriers, and liable only for reasonable diligence. The report states those facts in regard to their business and this particular contract which clearly bring them within the class of private carriers, and so liable only for reasonable diligence. An examination of authorities to establish this point we deem unnecessary.

The judgment of the county court is reversed, and judgment is rendered for the plaintiff for the twenty-five dollars and the seventy-five cents, and interest from the 20th of May, 1857, as stated in the report of the referee. The defendants' costs in this court to be deducted.