**578** AMERICAN DISTRICT TELEGRAPH CO. *v.* CITY OF NEW YORK.

First Department, July, 1925. [Vol. 213

THE AMERICAN DISTRICT TELEGRAPH COMPANY, Respondent, Appellant, *v.* THE CITY OF NEW YORK and Others, Appellants, Respondents, Impleaded with THE WESTERN UNION TELEGRAPH COMPANY, Respondent.

First Department, July 6, 1925.

Municipal corporations — action by telegraph corporation to have franchise agreement with city of New York declared void and to recover payments made thereunder — plaintiff was incorporated in 1871 under Telegraph Acts (Laws of 1848, chap. 265, as amd.) — statutes conferred right to use streets of city — board of estimate and apportionment passed resolution that if plaintiff desired to continue business in New York city it must apply for and secure franchise — franchise agreement was made under duress and is void — plaintiff is entitled to recover amounts paid with interest from date of demand.

A special franchise agreement entered into between the plaintiff and the city of New York relating to the use of the streets of the city by the plaintiff in the conduct of its business was executed by the plaintiff under duress and is void, and the payments made thereunder by the plaintiff may be recovered from the city, for it appears that the plaintiff was incorporated in 1871 under the Telegraph Acts (Laws of 1848, chap. 265, as amd.); that the statutes under which the plaintiff was incorporated gave it the right to use the highways of the State, including the streets of all cities in connection with its telegraph business; that in 1912 the board of estimate and apportionment of the city of New York passed a resolution to the effect that if the plaintiff desired to continue its business it must apply for and secure a franchise within a stated time; and that the plaintiff, under the compulsion of that resolution, entered into the franchise agreement in question and made payments thereunder according to its promise.

Since the plaintiff had the right to use the streets of the city of New York for the purpose of conducting its telegraph business, the city did not have the power to compel the plaintiff to procure a franchise or to compel it to pay for the use of the streets of the city for its business.

It is clear that the franchise agreement entered into by the plaintiff with the city of New York was not voluntarily entered into, in view of the fact that the resolution threatened to drive the plaintiff out of business unless it made a franchise agreement, and hence it must be held that the agreement was entered into by the plaintiff under duress in order to preserve its rights which it justly feared would be destroyed if it did not acquiesce in the demands of the city.

The plaintiff is entitled to recover interest on the amount paid under the franchise agreement as of the date it demanded repayment.

APPEAL by the defendants, The City of New York and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 12th day of January, 1924, upon the decision of the court rendered after a trial at the New York Special Term.

Appeal by the plaintiff, The American District Telegraph Com-

pany, from so much of said judgment as limits the interest recoverable by plaintiff on the several amounts paid by it to the city of New York.

The judgment in this case adjudges: (1) That a franchise contract dated February 20, 1913, is void; (2) that said defendants be restrained from enforcing the terms of such contract; (3) that the plaintiff recover $75,212.55 paid under the provisions of said contract by the plaintiff to the city as annual payments based on percentages of gross receipts since February 20, 1913, an initial deposit and payment for past use of the city's streets, with interest amounting to $14,241.30; (4) that defendants be restrained from selling or disposing of certain corporate stock of the city of New York, face value $10,000, deposited with the comptroller of the city to secure compliance with the provisions of said contract; and (5) that plaintiff obtain through its State charter authority to use the streets, public places and bridges of the city for the carrying on of a district messenger business.

*Atwater & Cruikshank* [*Edward L. Blackman* of counsel], for the plaintiff.

*Francis R. Stark* [*Edward L. Blackman* of counsel], for the defendant Western Union Telegraph Company.

*George P. Nicholson, Corporation Counsel* [*Vincent Victory* of counsel], for the defendants City of New York and others.

MARTIN, J.:

By this action the plaintiff, because of duress exercised by the defendant city of New York, through its board of estimate and apportionment, seeks to cancel a franchise agreement, entered into between the plaintiff and the city of New York, and to recover corporate stock and securities, deposited by plaintiff with the city pursuant thereto, as well as upwards of $75,000 paid under it by the plaintiff to the city between its inception on February 20, 1913, and October 29, 1918, and interest on that amount.

Shortly before the trial of the action, the city of New York made a motion for leave to implead the Western Union Telegraph Company as a party defendant upon the ground that certain property conveyed by plaintiff to the Western Union Telegraph Company passed to the city under the franchise agreement. An order bringing in that company was entered. Thereafter the Western Union Telegraph Company duly answered admitting and adopting the allegations of the complaint and demanding that it be adjudged that the plaintiff's agreement dated February 20, 1913, did not convey any property of the plaintiff to the city of New York, and that the plaintiff's agreement of December 31, 1918, with the Western Union

**580** American District Telegraph Co. *v.* City of New York.

First Department, July, 1925.          [Vol. 213

Telegraph Company, did convey to the latter company all of plaintiff's property situated in the streets of the city of New York. The court at a Special Term for trials rendered a decision in favor of the plaintiff, granting it all the relief sought in the complaint, excepting that interest was awarded from the date of demand and not from the dates of the various payments made by the plaintiff to the city. Judgment was entered on that decision on January 12, 1924. The defendant thereafter appealed to this court from the whole of said judgment, and the plaintiff appealed from that portion thereof which limited it in the recovery of interest.

The American District Telegraph Company, the plaintiff in this action, was organized in 1871 under the Telegraph Acts of the State of New York, being chapter 265 of the Laws of 1848, and the various acts amendatory thereof. These statutes conferred upon corporations properly incorporated thereunder the right to use the highways of the State, including the streets of all cities. Immediately upon plaintiff's incorporation it began to conduct its business, that of a district telegraph company. This business consisted originally of two branches — the call boxes, which were used for signalling the subscriber's need of a messenger or of aid from the police or fire department; and, secondly, what is known as a central office burglar alarm system business. The latter was sold to the Holmes Electrical Protective Company in 1883, and we are not now concerned with it. The call box business was continued until 1919, when the company dissolved, this branch of the business having been invaded by the telephone company and the Western Union Telegraph Company.

Prior to 1884 plaintiff had placed a number of its call box wires over the streets of the city of New York. It maintained but few poles and the great majority of its wires passed from housetop to housetop, affixed to structures upon roofs. During the course of its business it had in operation thirty to forty central offices in the city of New York, from each of which there radiated a number of so-called metallic circuits. To each of these circuits there were attached from 30 to 100 call boxes. The central offices were connected with police headquarters and with fire headquarters. The subscriber could not directly call either police headquarters or fire headquarters, but would transmit his call to the district office, which would in turn notify the police or the fire headquarters. The different central offices were connected with each other by regular Morse telegraph wires and were equipped with sending and receiving apparatus, but they were used merely for communicating from one office to another.

Apparently there was no interference with plaintiff's operations

in the streets of the city of New York until subsequent to the passage of the so-called Electrical Subway Acts, the first of which became a law June 14, 1884. (See Laws of 1884, chap. 534; Laws of 1885, chap. 499, as amd.; Laws of 1887, chap. 716, as amd.) Those acts prohibited the continuance of overhead wires in the cities of New York and Brooklyn, created a board to enforce the statutes and to provide means for the operation of the wires underground. The board contracted first with the Consolidated Telegraph and Electrical Subway Company to build underground ducts for the reception of both the low tension telephone and telegraph wires and the high tension electric light and power wires. This contract was ratified by a special act of the Legislature. (Laws of 1887, chap. 716, § 6.) Later the high tension and low tension subways were separated and the Empire City Subway Company, Limited, took over the low tension ducts from the Consolidated Company, thereafter constructing and operating all of that class of ducts. This contract was also authorized by the Legislature. (Laws of 1891, chap. 231.) The procedure followed by the board above referred to, which was styled the board of electrical control, was to have the subway company provide ducts in a certain section of the city, in which ducts the wire companies would be notified to put their wires underground throughout such section.

The plaintiff protested that it was not feasible for it to use the ducts and that the expense was prohibitive. The board, however, resolved that plaintiff should be forced to use the ducts and that no exception should be made in its favor. Thereafter plaintiff received notices from time to time to put its wires underground and in the subways; and it did take down a large number of its overhead wires and put them in the ducts of the Empire City Subway Company. Bare wires were used overhead but in the subways insulated cables were necessary. They were more expensive and the company avoided the use of the subways as far as possible. However, when it did not comply promptly enough with the orders of the board, city inspectors would cut its overhead wires, compelling it to use the subways.

In November, 1910, the board of estimate and apportionment of the city of New York passed a resolution indicating doubt concerning the right of certain companies, including the plaintiff, to operate in the streets of the city of New York; and demand was made on those companies to show by what authority they were respectively conducting their business in, and were using, the streets of the city. Plaintiff replied promptly setting up its incorporation under the Telegraph Acts and stood on its rights thereunder to operate in the streets.

**582** AMERICAN DISTRICT TELEGRAPH CO. *v.* CITY OF NEW YORK.

First Department, July, 1925. [Vol. 213

On January 18, 1912, the board of estimate and apportionment passed a resolution wherein it recited that it was advised by opinion of the corporation counsel that the Holmes Electric Protective Company, the American District Telegraph Company, the Stock Quotation Telegraph Company and the Frederick Pierce Company either had no right in the streets or no rights greater than revocable licenses. After such recital the resolution continued to the effect that each of the four companies be required, "*if they desire to continue the business*," to apply for and obtain franchises. The resolution gave each of the companies in question nine days within which to signify its intention of applying for a franchise, and thirty days within which to have a properly incorporated company make a formal, sworn application therefor.

Confronted with this resolution plaintiff applied for a franchise, and, after much correspondence as to details, a franchise contract was entered into between the company and the city of New York on February 20, 1913. It required plaintiff to pay three per cent of its gross income to the city each year, in addition to other stated payments. The Holmes Electric Protective Company and the Stock Quotation Telegraph Company, mentioned in the resolution, also obtained franchises from the city of New York.

The action of the Holmes Electric Protective Company, which did not take out a franchise until after it had begun a suit against the city for an injunction, was brought on for trial and was decided in favor of the defendant. (*Holmes Electric Protective Co.* v. *Armstrong,* 97 Misc. 184.) The Holmes Company thereupon appealed to the Appellate Division. The present plaintiff intervened upon the appeal to this court. (*Holmes Electric Protective Co.* v. *Williams,* 181 App. Div. 687.) The judgment was here affirmed and an appeal was taken by the Holmes Company to the Court of Appeals. The plaintiff took part in that appeal. (228 N. Y. 407.) The Court of Appeals reversed the judgment below and directed a new trial, which occurred in June, 1920. Judgment for the Holmes Company resulted on that trial. The city of New York appealed to this court, where the judgment was unanimously affirmed without opinion. (197 App. Div. 947.)

Soon after the judgment at Special Term in favor of the Holmes Company had finally established that the franchises held by companies incorporated under the Telegraph Acts and operating in the streets of the city of New York prior to the year 1884 were not subject to indirect revocation through the Electrical Subway Acts (*Holmes Electric Protective Co.* v. *Williams,* 228 N. Y. 407), this plaintiff made a demand upon the city of New York for the return to it of the moneys which it had paid under its so-called franchise

contract, upon the ground that it had always had a valid franchise in the streets and that the city's action in compelling it to pay for the right to do business, when it already had that right, constituted duress. The city did not comply with the demand, and this action was brought on March 9, 1921.

The plaintiff contends that the franchise which it took from the city of New York in 1913 was the result of duress.

After the plaintiff's rights were challenged by the city of New York in 1910 and after plaintiff had indicated that it relied on the Telegraph Acts, the board of estimate and apportionment, on January 18, 1912, adopted the resolution notifying the companies concerned, including the plaintiff, that, if they were to continue the business in which they were engaged, they would have to apply for franchises by verified petition to the board of estimate and apportionment. Plaintiff asserts it was thus required to comply with the requirements of the city or to go out of business.

It is idle to say that the plaintiff voluntarily entered into the contract. It had valuable rights which, by entering into the agreement, it would relinquish. Indeed, it incurred an obligation to pay large sums of money for a franchise which it already had and for which it was not obligated to pay. It is not probable that this plaintiff voluntarily acquiesced in the demand of the city.

In 13 Corpus Juris (§ 310) duress is defined as follows: " Duress is that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind of a person of ordinary firmness. It consists not merely in the act of imprisonment or other hardship to which the party was subjected, but in the state of mind produced by those circumstances, and in which the act sought to be avoided was done."

In Williston on Contracts (Vol. 3, § 1603) the author says: "" There is no doubt that the modern tendency of courts of law is to regard any transaction as voidable which the party seeking to avoid was not bound to enter into and which was coerced by fear of a wrongful act by the other party to the transaction. The earlier requirements of common-law duress may be regarded as merged in this broader definition."

In *Kilpatrick* v. *Germania Life Ins. Co.* (183 N. Y. 163, 169) the Court of Appeals in sustaining a cause of action for duress said: " In effect the defendant held plaintiff's property in its grasp through its lien thereon and would not surrender it until the unlawful exaction was complied with. The payment was made to free the property from the duress as much as if it had been a chattel

**584** American District Telegraph Co. *v.* City of New York.

First Department, July, 1925. [Vol. 213

and the defendant had it in his possession under a pledge, refusing to part with it unless the bonus was paid. * * *

" The distinction between a voluntary and involuntary payment is very clearly pointed out in many cases. In *Tripler* v. *Mayor, etc., of N. Y.* (125 N. Y. 617), Judge Peckham states (p. 625): ' The very word used to describe an involuntary payment, imports a payment made against the will of the person who pays. It implies that there is some fact or circumstance which overcomes the will and imposes a necessity of payment in order to escape further ills.'

" In *Scholey* v. *Mumford* (60 N. Y. 498), Judge Rapallo remarks (p. 501): ' To constitute a voluntary payment the party paying must have had the freedom of exercising his will. When he acts under any species of compulsion the payment is not voluntary.'

" In *Bates* v. *New York Ins. Co.* (3 Johns. Cas. 238), Justice Thompson states (p. 239): ' The equitable extension of this kind of action ' (money had and received) ' has of late been so liberal, that it will lie to recover money obtained from any one by extortion, imposition, oppression, or taking an undue advantage of his situation. In the present case, there was, at least, an undue advantage taken of the plaintiff's situation. * * * The money being inequitably demanded of him, he must be presumed to have paid it, relying on his legal remedy to recover it back.'

" In *Buckley* v. *Mayor, etc., of N. Y.* (30 App. Div. 463), Justice Barrett states (p. 465): ' There is no ironclad rule which confines an involuntary payment to cases of duress of person or restraint of goods. Money compulsorily paid to prevent an injury to one's property rights comes within the same principle. (*Carew* v. *Rutherford,* 106 Mass. 1.)' This case was affirmed without opinion in 159 N. Y. 558.

" In *Radich* v. *Hutchins* (95 U. S. 210), Mr. Justice Field states (p. 213): ' To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, for which the latter has no other means of immediate relief than by making the payment.' * * * *"

In *Herold* v. *Kahn* (159 Fed. 608, 612) the court said: " Every demand by one clothed with official legal authority to make the demand, imposes a certain compulsion on the one upon whom the demand is made. Such a demand is always exigent and places a recusant in a position of disadvantage."

In *Swift Co.* v. *United States* (111 U. S. 22) the Supreme Court

of the United States said: " We cannot hesitate to answer that question in the negative. The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction, or discontinue its business. It was in the power of the officers of the law, and could only do as they required. Money paid or other value parted with, under such pressure, has never been regarded as a voluntary act within the meaning of the maxim, *volenti non fit injuria.*

" In *Close* v. *Phipps*, 7 M. & Gr. 586, which was a case of money paid in excess of what was due in order to prevent a threatened sale of mortgaged property, TINDAL, C. J., said: ' The interest of the plaintiff to prevent the sale, by submitting to the demand, was so great, that it may well be said the payment was made under what the law calls a species of duress.' And in *Parker* v. *Great Western Railway Company*, 7 M. & Gr. 253, the wholesome principle was recognized that payments made to a common carrier to induce it to do what by law, without them, it was bound to do, were not voluntary, and might be recovered back. Illegal interest, paid as a condition to redeem a pawn, was held in *Astley* v. *Reynolds*, 2 Stra. 915, to be a payment by compulsion. This case was followed, after a satisfactory review of the authorities, in *Tutt* v. *Ide*, 3 Blatchf. 249; and in *Ogden* v. *Maxwell*, 3 Blatchf. 319, it was held that illegal fees exacted by a collector, though sanctioned by a long-continued usage and practice in the office, under a mistaken construction of the statute, even when paid without protest, might be recovered back, on the ground that the payment was compulsory and not voluntary. And in *Maxwell* v. *Griswold*, 10 How. 242–256, it was said by this court: ' Now it can hardly be meant, in this class of cases, that to make a payment involuntary, it should be by actual violence or any physical duress. It suffices, if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly, and in consequence of that illegality, and without being able to regain possession of his property, except by submitting to the payment.' To the same effect are the *American Steamship Company* v. *Young*, 89 Penn. St. 186; *Cunningham* v. *Munroe*, 15 Gray, 471; *Carew* v. *Rutherford*, 106 Mass. 1; *Preston* v. *Boston*, 12 Pick. 7. In *Beckwith* v. *Frisbie*, 32 Vt. 559–566, it was said: ' To make the payment a voluntary one, the parties should stand upon an equal footing.' If a person illegally claims a fee *colore officii*, the payment is not voluntary so as to preclude the party from recovering it back. *Morgan* v. *Palmer*, 2 B. & C. 729. In *Steele* v. *Williams*, 8 Exch. 625, MARTIN, B., said: ' If a statute prescribes certain fees for certain services, and a party assuming to act under it insists

upon having more, the payment cannot be said to be voluntary.' ' The common principle,' says Mr. Pollock, Principles of Contract, 523, ' is, that if a man chooses to give away his money, or to take his chances whether he is giving it away or not, he cannot afterwards change his mind; but it is open to him to show that he supposed the facts to be otherwise, or that he really had no choice.' Addison on Contracts, *1043; *Alston* v. *Durant,* 2 Strob. 257."

In *Buckley* v. *Mayor* (30 App. Div. 463; affd., 159 N. Y. 558) an independent contractor's foreman was told by a city inspector that, unless a permit was taken out for the work, the inspector would have him arrested. The foreman notified his employer, the plaintiff's assignor, who forthwith made an application for a permit and paid $403 therefor. It was held that the money had been paid under duress, that no protest was required, and that plaintiff could recover.

In *Aronoff* v. *Levine* (190 App. Div. 172) the court said: " The instrument lacked legal consent. Even in the absence of protest, or express reservation, such fruits of fraudulent oppression should not be upheld."

It was held in *Cox* v. *Welcher* (68 Mich. 263) that, where payments are involuntary and have been made under legal duress, there is no rule requiring a specific protest. (See, also, *Boston & Sandwich Glass Co.* v. *City of Boston,* 4 Metc. 181.)

The franchise agreement was not a voluntary act. It was made in order to preserve rights which the plaintiff feared would be destroyed if it did not acquiesce in the demands made by the representatives of the city and enter into the agreement. There was duress sufficient to require the judgment it has obtained.

In most cases which appear to be to the contrary, facts appeared which warranted the view that the payment or the contract had been voluntarily made to obtain some benefit sought.

The plaintiff by this contract relinquished valuable rights which were surrendered in the belief that, if the contract were not entered into, its business would be destroyed. The contract was not to plaintiff's benefit, for without it plaintiff was in a better position.

The plaintiff appeals from that part of the judgment which limits the recovery of interest. The plaintiff is entitled to interest from the date of the demand, and not from the date of payment. (*Boston & Sandwich Glass Co.* v. *City of Boston, supra.*)

We have reached the conclusion, therefore, that the judgment is correct and should be affirmed, with costs to the plaintiff.

CLARKE, P. J., DOWLING, FINCH and MCAVOY, JJ., concur.

Judgment affirmed, with costs to the plaintiff against the defendants, appellants.