OPINION OF THE COURT
Martin Schoenfeld, J.
In this action plaintiff the City of New York (the City) is suing defendant 17 Vista Associates (Vista), a real estate developer, to enforce an alleged contractual obligation of Vista to pay $500,000 to a trust for low- and moderate-income housing. We now grant the City’s motion for summary judgment.
BACKGROUND
The Seamen’s Church Institute (the Institute) (not a party to this action) is a not-for-profit religious corporation. In 1968 moved into a building (the existing building) that had housing accommodations for seafarers. In succeeding years the occupancy level declined, and the Institute began accepting non-seafarers. By 1983 the occupancy level had fallen below 50%, and in 1984 the Institute contracted to sell the property to Vista. Vista intended to demolish the existing building and replace it with an office tower. Closing was set for March 4, 1985.
Operating under the erroneous assumption that a charitable entity would not be subject to the City’s SRO laws (infra), the Institute assumed that Vista would be able to demolish the building upon closing. However, in or about February of 1985 Vista was denied a demolition permit by the City’s Department of Buildings. As a "class B multiple dwelling” the existing building was prima facie a "single room occupancy (a living unit which shares a kitchen and/or bathroom with other units) multiple dwelling” (SRO) as defined in both Local Laws, 1983, No. 19 of the City of New York (the "antiharassment” law) and in the then-pending Local Laws, 1985, No. 59 of the City of New York (the first "moratorium” law). Local Law No. 19 required that anyone seeking to demolish an SRO apply to the City for a certificate of no harassment. The certificate is granted if no harassment of tenants has occurred within a specified period prior to the application. Local Law No. 19’s definition of SRO provides an exemption for "residences whose occupancy is restricted to an institutional use such as housing intended for use primarily or exclusively by the employees of a single company or institution”.
*196 Local Law No. 59, signed into law on August 5, 1985, placed an 18-month moratorium on the alteration or demolition of SROs, beginning on and retroactive to January of 1985, and also contained an "institutional use” exemption.
After Vista’s demolition permit application was denied, Vista refused to proceed with the closing unless the City determined that the existing building was not subject to the SRO laws. In March of 1985 the Institute urgently requested the City to grant an "institutional use” exemption. This led to ongoing negotiations, during which the Institute was in dire financial straits. Hoping to prevent the Institute’s demise and see the site developed, the City informed the Institute that if the Institute could guarantee the continuation of its housing programs, the City would be willing to accept, without independent investigation, the Institute’s factual representations regarding the history of the existing building and determine that the existing building was entitled to an institutional use exemption. Since the Institute could not spend funds to aid nonseafarers, it was decided that the Institute would seek $500,000 from Vista. As Vista represented that it did not have such funds available at that time, the City agreed to accept a promissory note.
Thus on July 24, 1985 (1) the City’s Department of Housing Preservation and Development (HPD) wrote a letter (the Exemption Letter) to the City’s Buildings Department granting an "institutional use” exemption to the existing building; (2) the Institute and Vista entered into "the Contract” (infra); (3) Vista executed "the Note” (infra); and (4) Vista and the Institute closed on the property.
The Exemption Letter states as follows: "Based on representations of the [Institute] * * * [HPD] has determined that [the existing building does] not constitute [an SRO] under Local Law 19 * * * because the * * * premises have been used for an 'institutional use’ within the meaning of such law. Consequently, a certificate of no harassment is not required under such law. Furthermore, should the Mayor sign [Local Law No. 59 of 1985], the Premises, for the same reason * * * will not be considered [an SRO] thereunder.” The Contract provides, in relevant part, as follows:
"In connection with the purchase of [15 State Street] * * * [Vista intends to erect] upon the Property a new commercial office building * * *. There have been publicized concerns that portions of the existing structure * * * may have been used as [an SRO]. * * * However, the City has determined that the *197 Existing Structure has not been so utilized * * * and has duly issued a [demolition permit].
"[Vista] has expressed its concern that the above-mentioned publicity may cause an impediment to [Vista] in the various City processes involved in obtaining a duly issued [construction permit], * * *
"Consequently, the [Institute] has decided to establish a trust * * * to assist in the housing of seamen and others of low and moderate income * * *. [Vista] has agreed to be a contributor to the Trust * * *. By this manner, the Institute, [and Vista], can ensure that the development of the Property will be without any pejorative stigma.
"Accordingly * * * [Vista] agrees to pay to the Trust, the sum of $500,000 upon the earlier of (a) the date a duly issued permit or permits has or have been timely delivered to [Vista] permitting the lawful construction of the New Building”.
The Note provides, in relevant part, as follows: "for value received, [Vista] promises to pay [the Institute], or its assignee, the sum of $500,000, inclusive of interest, upon the earlier of (a) [Vista’s] timely receipt of a duly issued permit or permits permitting the lawful construction of a new commercial office building”.
Vista demolished the existing building; received, on October 1, 1986, a "building permit”; and erected an office tower. Solely for purposes of this motion, this court will assume, arguendo, that the approval process was unnecessarily protracted, causing delays, increased costs, and lost revenues. In June of 1987 the trust demanded payment of the Note. Vista refused, and the City sued.
DISCUSSION
In opposition to the City’s motion Vista asserts that none of the contingencies set forth in the Contract and the Note (collectively, the Agreement) has, or will, occur; that the Agreement is unenforceable for lack of consideration; that the Agreement was executed under duress; that the Agreement was executed to avoid application of a law later declared unconstitutional; and that the Agreement violates public policy.
OCCURRENCE OF CONTRACTUAL CONTINGENCIES
The Contract states that "[Vista] agrees to pay to the Trust, the sum of $500,000 upon * * * (a) the date a duly issued *198 [construction] permit * * * has * * * been timely delivered to [Vista]”. The City claims that Vista thus owed $500,000 to the trust on October 1, 1986. Vista argues that "timely” should be read as meaning "without unnecessary delay” rather than as meaning "without any delay attributable to the existing building’s possible status as an SRO.” However, this argument is untenable because it is totally contrary to the undisputed context and purpose of the Agreement.
The sole reason for the negotiations was the Institute’s and Vista’s need for a prompt and favorable determination of SRO status. Other than the recollections of Mr. Robert Kaufman (Kaufman), a principal of Vista, some five years after the events at issue, there is absolutely no evidence in the record that Vista was willing to promise to pay $500,000 for anything other than a prompt and favorable SRO determination. Thus this case falls under the rule enunciated in Matter of Herzog (301 NY 127, 135-136 [1950]): "In resolving [problems of construction] primary attention must be given to the manifest purpose sought to be accomplished. When this is ascertained it will take precedence over all other canons of construction * * *. Substance must not be destroyed in deference to the naked word”. However, even if we assume that Kaufman’s recollections are absolutely correct, the Agreement cannot be interpreted as he would like. For example, Kaufman states as follows: "the City now claims that the 'timely’ issuance of the building permits referred to in the Note meant the issuance of said permits 'without further impediment arising from the [SRO question].’ [I] never understood it that way, nor, I respectfully submit, could the Note be read that way.” Absent from Kaufman’s own version of events is any testimony that he or the City ever mentioned any non-SRO-related meaning of "timely”. He simply tells us what he "understood” — which is irrelevant (Peripheral Equip. v Farrington Mfg. Co., 29 AD2d 11, 13 [1st Dept 1967] ["The relevant contractual intent is that expressed in the contract, even though it may not accord with the subjective intent of the parties”]) — and opines that the Note could not "be read” any other way, an opinion that this court rejects as a matter of law. An example of the clear meaning of "timely” is Vista’s own statement that the Contract and Note "are void as against public policy, since they require * * * Vista to pay $500,000 to avoid the requirements of an unconstitutional statute. ” Indeed, Kaufman himself has said that "[i]t certainly should leap out as very obvious to the *199 Court that the [Contract] and Note were in consideration for the HPD letter.” Thus whatever Kaufman "understood”, the plain meaning of "timely” is "without delay attributable to the existing building’s possible SRO status.”
CONSIDERATION
It is axiomatic that "there must be consideration in contracts in order to make them valid.” (E.g., I & I Holding Corp. v Gainsburg, 276 NY 427, 433 [1938].) Vista argues, essentially, that if the existing building was not an SRO, as indicated in the Exemption Letter, then the issuance of the Letter was something to which Vista was automatically entitled, and thus could not have been consideration. However, the consideration here was the City’s prompt and favorable resolution of the problematic SRO issue. The City was always willing to process an exemption application without a foreordained result, in the normal course of business.
DURESS
Under New York law, a contract is voidable on the ground of duress when the complaining party "was compelled to agree to the contract terms because of a wrongful threat * * * which precluded the exercise of its free will.” (805 Third Ave. Co. v M.W. Realty Assocs., 58 NY2d 447, 451 [1983].) Vista must present evidence of the following: (1) that the City made a wrongful threat (see, Muller Constr. Co. v New York Tel. Co., 40 NY2d 955, 956 [1976]); (2) that Vista was suffering serious financial difficulties (see, Finserv Computer Corp. v Bibliographic Retrieval Servs., 125 AD2d 765, 767 [3d Dept 1986]), or faced an immediate threat, such as a loss of property, which deprived Vista of its free will (Austin Instrument v Loral Corp., 29 NY2d 124, 131 [1971]); and (3) that Vista had no legal remedies or other alternatives (Austin Instrument v Loral Corp., 29 NY2d, at 130-131; Finserv Computer Corp. v Bibliographic Retrieval Servs., 125 AD2d, at 767).
The gist of Vista’s claim that it was subject to a "wrongful threat” is set forth by Kaufman as follows: "the City, knowing full well of the * * * Institute’s financial troubles and knowing full well that the Building was not an SRO, ruthlessly played political 'hardball,’ and strong-armed * * * [Vista] through the use of bad-faith negotiating tactics into agreeing to pay [$500,000] in return for a favorable City ruling and other promises by the City.” However, Vista has failed to *200 present a shred of evidence that the City knew any such thing. Under Local Laws, 1983, No. 19 of the City of New York and Local Laws, 1985, No. 59 of the City of New York, the building presumptively was an SRO. The City states that whether the existing building was an SRO was a "close question”, and that the various difficult issues "would have required some time to resolve”. Even if the majority of the Institute’s tenants were seafarers, City officials questioned the applicability of an exemption since these seafarers were not "employees” of "the institution”, the example the statutes gave for such an exemption.
Vista argues that since the City determined that the existing building was not an SRO, "there was no legitimate basis to support a determination that it was an SRO.” However, this logical fallacy ignores the foregoing facts pointing towards SRO status and the possibility that, as apparently was the case, reasonable minds could have differed about the existing building’s status.
Vista argues that it was deprived of its free will because it would have lost its substantial preclosing expenses if it had not entered into the Agreement. However, Vista must accept the consequences of having moved headlong into a major real estate development project without checking all of the legal implications. Furthermore, by the time Vista made its first payment to keep the Institute afloat, Vista had already been denied a demolition permit, and so was clearly on notice of the problematic SRO issue. A sophisticated developer is not "deprived of its free will” simply because it finds itself in a legal cul-de-sac, withdrawal from which will inevitably cost it money, where the developer had constructive (and some actual) notice of the problems looming on the horizon. (See, Sadowsky v City of New York, 732 F2d 312, 318 [1984] [developers "might * * * have cut future losses by refusing to close, just as they might have sought to recoup losses incurred prior to closing through court action”].)
Finally, Vista had alternatives to entering into the Agreement: Vista could have abandoned its development plan; it could have sought a formal determination of SRO status; it could have brought a CPLR article 78 proceeding challenging an adverse determination or the constitutionality of Local Law No. 59.
THE SRO LAWS
Vista contends that the Agreement is void because Vista entered into it only to avoid application of Local Law Nos. 19 *201 and 59, and Local Law No. 59 has, in effect, been held unconstitutional by the decision in Seawall Assocs. v City of New York (74 NY2d 92, cert denied 493 US 976 [1989]). Plaintiffs counter (1) that Local Law No. 59 has not, in effect, been held unconstitutional; (2) that even if it has, the Agreement would still be valid; and (3) that, in any event, the Agreement is valid since it was entered into partly to avoid application of Local Law No. 19. It is our opinion (1) that Local Law No. 59 must now be viewed as having been unconstitutional; (2) that the Agreement would still be valid even if entered into to avoid application of Local Law No. 59; and (3) that, in any event, the agreement is valid since it was entered into partly to avoid application of Local Law No. 19.
Local Law No. 19 was upheld against constitutional challenge in Sadowsky v City of New York (732 F2d 312 [2d Cir 1984], supra). Local Law No. 59, prohibiting the alteration or demolition of SROs from early 1985 to July of 1986, expired without constitutional challenge. Local Laws, 1986, No. 22 of the City of New York extended the "moratorium” through the end of 1986 and, in addition, imposed affirmative obligations upon SRO owners to rehabilitate and rent all vacant units (generally referred to as "antiwarehousing” provisions). In Seawall Assocs. v City of New York (134 Misc 2d 187 [Sup Ct, NY County 1986] ["Seawall I”]) Judge David Saxe held that the "antiwarehousing” provisions were unconstitutional violations of due process of law.
Without appealing this decision, the City enacted Local Laws, 1987, No. 9, which, with certain changes, essentially continued the "moratorium” and "antiwarehousing” provisions found in Local Law No. 22. In Seawall Assocs. v City of New York (138 Misc 2d 96, 115 [1987] ["Seawall II”]), Judge Saxe likewise found Local Law No. 9 to constitute (1) a violation of due process and (2) a "taking” without just compensation.
Judge Saxe’s views were upheld in Seawall Assocs. v City of New York (74 NY2d 92, cert denied 493 US 976 [1989], supra ["Seawall III”]). In section II (B) (1) (supra, at 107-110), the court found the "moratorium” and "antiwarehousing” provisions taken together to be an unconstitutional "regulatory taking”. "Moreover, these [antiwarehousing] provisions — together with the [moratorium provisions] * * * — deny owners of SRO buildings any right to use their properties as they see *202 fit. Unquestionably, the effect of the law is to strip owners of SRO buildings — who may have purchased their properties solely to turn them into profitable investments by tearing down and replacing the existing structures with new ones * * * — of the very right to use their properties for any such purpose” (supra, at 108).
In the conclusion of section II (B) (1) the court stated as follows: "the moratorium and antiwarehousing provisions 'placed petitioners in a business, force[] them to remain in that business and refuseQ to allow them to ever cease doing [that] business.’ * * * [T]he conclusion is inescapable that the effect of the provisions is unconstitutionally to deprive owners of economically viable use of their properties” (supra, at 110).
In 245-259 Realty Co. v City of New York (NYLJ, June 19, 1991, at 22, cols 3, 4 [Sup Ct, NY County 1991]), Justice DeGrasse stated as follows: "the provisions of Local Laws 59 and 22, although not specifically addressed in [Seawall III], constitute per se compensable takings under the reasoning and holding of the Court of Appeals as the Court declared unconstitutional [certain] provisions contained in all three Local Laws [i.e., 59, 22, and 9].”
Although the Court of Appeals in Seawall III was faced with a law that contained a moratorium and antiwarehousing provisions, the court’s continual references to the moratorium provisions strongly suggest that the former, even without the latter, would not have passed constitutional muster. Finally, Seawall Ill’s focus on the deprivation of owners’ "economically viable use of their properties,” compels the conclusion that Local Law No. 59 was unconstitutional.
In discussing whether an agreement to pay money to promptly and favorably resolve the question of the application vel non of a statute is valid in light of the subsequent invalidation of the statute, both sides here cite to a line of cases discussing the circumstances under which a person may recover fees or taxes paid under a subsequently invalidated statute or regulation. In American Dist. Tel. Co. v City of New York (213 App Div 578 [1st Dept 1925], affd 243 NY 565 [1926]), the court held that the City could not keep moneys paid pursuant to a franchise agreement where the Court of Appeals later held that the "franchisee” had a preexisting right to conduct its business. However, "[i]n most cases which [have held money not recoverable because there was no duress] * * * the payment or the contract had been voluntarily *203 made to obtain some benefit sought” (supra, 213 App Div, at 586). In the instant case, Vista obtained a prompt and favorable resolution under both the antiharassment and the antimoratorium law.
In Mercury Mach. Importing Corp. v City of New York (3 NY2d 418, 430 [1957]), the Court of Appeals, in denying recovery of taxes paid without protest under a statute later held unconstitutional, stated as follows: "it would not do to permit parties to avoid completed transactions whenever the courts overturned an old rule of law, or made a new rule in a later case of first impression, which might have affected the transaction if it had preceded it. There can be no recovery in any field due to ignorance of the law governing a transaction entered into at a time when there was no statute or authoritative court decision in existence upon the point involved.” (Emphasis added.)
In Jenad, Inc. v Village of Scarsdale (23 AD2d 784 [2d Dept 1965], revd 18 NY2d 78 [1966]), the court compelled the return of money paid pursuant to an "unconstitutional” (later held constitutional) requirement that real estate developers pay money to a park and recreational fund.
Plaintiffs claim that cases such as Jenad (supra) are questionable after the leading case of City of Rochester v Chiarella (58 NY2d 316, 323, cert denied sub nom. Quality Packaging Supply Corp. v City of Rochester, 464 US 828 [1983]), where Judge Wachtler stated as follows: "The rules concerning the circumstances under which recovery of a payment made pursuant to an assessment later declared illegal may be had are well settled. Generally, the voluntary payment of a tax or fee may not be recovered * * *. When a payment is made under a mistake of law, with actual or constructive knowledge of the facts * * * it is incumbent upon the taxpayer to demonstrate that payment was made involuntarily * * *. The failure to register formal protest * * * will be excused in cases in which the payment is made under duress or coercion. The duress necessary to indicate involuntariness is present in circumstances where payment of a tax is necessary to avoid threatened interference with present liberty of person or immediate possession of property”. Vista did not lodge a formal protest to the Agreement, and since it did not even own the property neither aspect of duress quoted above is present here. Also, not until this action did Vista question the legality or propriety of the Agreement.
*204 In any event, in the cases cited by Vista, the claimants received absolutely no direct benefit from the taxes or fees involuntarily and illegally imposed upon them. That situation is clearly distinguishable from one where a person under severe, self-imposed pressure agrees to pay money for a prompt and favorable determination of the inapplicability of two statutes, one of which is later, in effect, declared unconstitutional. (See, 3 Corbin, Contracts § 617, at 756-757 [1960] ["Restitution for mistake of law may properly be refused because * * * (5) the payment may have been made in settlement of a disputed claim, with consciousness that the legal right was doubtful”].)
PUBLIC POLICY ARGUMENT
Vista argues that the Agreement is void as against public policy. "Contracts are illegal at common law, as being against public policy, when they are such as to injuriously affect, or subvert, the public interests.” (Johnston v Fargo, 184 NY 379, 384 [1906].) Vista claims the Agreement "subverts the public interest” of assuring that government does not abuse its powers by unlawfully extracting money from its citizens. The general rule is: "The legality of agreements to influence administrative or executive officers or departments is to be determined by weighing all the elements involved and then deciding whether the inherent tendency of the agreement is to invite or promote sinister or corrupt means to accomplish the desired end.” (21 NY Jur 2d, Contracts, § 166, at 570 [1982].) In light of our rejection of Vista’s contentions that the City "knew” that the existing building was not an SRO, we also find that there was no "promotion of sinister or corrupt means” in the Agreement. Nobody’s pockets were lined by an abuse of the public trust. Furthermore, "efforts to use ['public policy’] as a sword for personal gain rather than a shield for the public good should not be countenanced” (Charlebois v Weller Assocs., 72 NY2d 587, 595 [1988]).
We note, though, that this court certainly is not putting its imprimatur on the way the Institute, Vista, and the City handled the situation they faced. A perception may have been created that the City worked too closely with a private developer — and as to this, the facts must speak for themselves. However, this court would not thereby be deprived of the power to compel a sophisticated business enterprise to honor a financial obligation made to the City in return for help in *205 clearing what were, or at least appeared to be, reasonable hurdles applicable to all.
CONCLUSION
New York City’s regulation of commercial real estate development may be absurdly onerous. Then again, such regulation, in order to, inter alla, preserve essential housing, may be generously protective of the general citizenry. It may be both. However, these are issues for the legislative branch of government. The issue before us is, essentially, whether a real estate developer may refuse to pay an obligation to a municipality incurred, in the face of a crushing deadline, to "expedite” the developer’s way through an unanticipated roadblock presented by a regulatory scheme in a state of flux. We hold, essentially, that a mutually beneficial resolution, entered into in good faith by the municipality, creates a binding contract. The developer may not accept the benefits of the bargain and avoid its obligations thereunder.